No. 25-1037

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

JOHN AND JANE DOE,

Appellants,

v.

PHILIP WEISER,

in his official capacity as Attorney General of Colorado, *et al.*,
Appellees.

_____

On Appeal from the Orders of the United States
District Court for the District of Colorado

The Honorable Charlotte N. Sweeney

District Court Case Number: 1:24-cv-02185-CNS-SBP

_____
**BRIEF OF APPELLANTS**

**ORAL ARGUMENT REQUESTED**

JOSHUA W. DIXON
ERIC A. SELL

Center For American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
jdixon@libertycenter.org
esell@libertycenter.org

Attorneys for Plaintiffs-Appellants John and Jane Doe

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................... 4

ISSUES PRESENTED................................................................................ 5

STATEMENT OF THE CASE.................................................................... 6

   I.    FACTUAL BACKGROUND........................................................ 6

      A.  Background On Gender Dysphoria........................................... 6

         1.   Gender Dysphoria and its Treatment in Minors ................... 6

         2.   Social Transitioning is a Form of Psychological Treatment.................. 7

         3.   Parental Consent is Necessary to Socially Transition Minors ........................................................................... 8

      B.  The Name Change Law and Parental Exclusion Policy ........... 9

      C.  The District Socially Transitions A.D. At School ................. 10

         1.   A.D.'s middle school.......................................................... 10

         2.   A.D.'s freshman year ........................................................ 12

         3.   A.D.'s sophomore year ..................................................... 13

         4.   A.D.'s junior year.............................................................. 13

   II.   PROCEDURAL HISTORY ....................................................... 14

SUMMARY OF THE ARGUMENT ........................................................ 15

ARGUMENT ........................................................................................... 18

STANDARD OF REVIEW ...................................................................... 18

   I.    THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE DOES ARE NOT SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS................................................................................... 18

i

A. It is substantially likely the Does have standing ..................................... 18

    1. The Does are suffering continuing injury. .......................................... 20

        a. The Policy precludes the Does from obtaining truthful information about their children.......................................... 20

        b. The Law and Policy alter the constitutionally required decisional framework. ....................................................... 22

        c. The Law and Policy require the Does to modify their behavior to combat their influence.................................... 23

    2. The Law and Policy will injure the Does in the future. ....................... 24

B. The Does are substantially likely to prevail on their claims.................. 30

    1. The Law and Policy infringe the Does' parental rights ...................... 31

        a. Parents have the right to consent when the government provides healthcare treatment to their children............................. 31

        b. Parents have the right to consent when the government makes important decisions in the lives of their children................. 34

        c. Parents have the right to maintain the integrity of their family.............................................................................. 37

    2. The Law and Policy do not satisfy any standard of review. ................ 39

        a. The Law and Policy fail strict scrutiny ............................................. 39

        b. The Law and Policy fail rational basis review ................................. 42

    3. The Law and Policy violate the Does' procedural due process rights......................................................................... 42

II. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE DOES' HARM WAS NOT IRREPARABLE....................................................................... 43

III. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE BALANCE OF HARMS FAVORED APPELLEES ........................................................... 46

IV. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST ............................ 47

V. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY DENYING THE DOES' MOTION FOR PRELIMINARY INJUNCTION ................................................ 47

VI. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER AND AG DISMISSAL ORDER BY CONCLUDING THE ATTORNEY GENERAL WAS ENTITLED TO SOVEREIGN IMMUNITY ............................................ 48

CONCLUSION ................................................................................ 54

WORD COUNT CERTIFICATE ....................................................... 56

10th Cir. R. 28.2(C)(2) STATEMENT .............................................. 57

10th Cir. R. 28.2(A)(1) COPIES OF OPINIONS AND ORDERS ...................... 58

District Court Order denying Plaintiffs' Motion for Preliminary Injunction filed January 27, 2025 ....................................................... 59

District Court Order granting Attorney General's Motion to Dismiss filed January 27, 2025 ............................................................. 81

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021)
  *rev'd on other grounds*, 600 U.S. 570 (2023) .............................................. 52, 54

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ........................................................................19

*Alfonso v. Fernandez*,
  606 N.Y.S.2d 259 (N.Y. App. Div. 1993)...........................................35

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ........................................................................23

*Arnold v. Bd. of Educ. of Escambia Cnty.*,
  880 F.2d 305, 312 (11th Cir. 1989)...................................................38

*Arredondo v. Locklear*,
  462 F.3d 1292 (10th Cir. 2006) ........................................................30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................49

*Bd. of Dir. of Rotary Intern. v. Rotary Club*,
  481 U.S. 537 (1987) .................................................................. 30, 38

*Bella Health & Wellness v. Weiser*,
  699 F. Supp. 3d 1189 (D. Colo. 2023) ..............................................54

*C.N. v. Ridgewood Bd. of Educ.*,
  430 F.3d 159 (3d Cir. 2005) ....................................................... 35, 37

*Cache Valley Elec. Co. v. Utah Dep't of Transp.*,
  149 F.3d 1119 (10th Cir. 1998)........................................................19

*California v. Texas*,
  593 U.S. 659 (2021) ............................................................ 19, 25, 28

*Chamber of Com. of U.S. v. Edmondson*,
  594 F.3d 742 (10th Cir. 2010)................................................... 50, 51

iv

*Citizen Ctr. v. Gessler*,
  770 F.3d 900 (10th Cir. 2014) ...................................................... 19, 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................. 27, 28, 29

*Clark v. Quiros*,
  No. 3:19-CV-575 (VAB),
  (D. Conn. July 26, 2024) 2024 WL 3552472 ...................................32

*Clements v. Fashing*,
  457 U.S. 957 (1982) ..................................................................23

*Colo. Envtl. Coalition v. Wenker*,
  353 F.3d 1221 (10th Cir. 2004) ....................................................18

*Colo. Outfitters Ass'n v. Hickenlooper*,
  823 F.3d 537 (10th Cir. 2016) .....................................................27

*Colon v. Collazo*,
  729 F.2d 32 (1st Cir. 1984) ..........................................................31

*Deanda v. Becerra*,
  96 F.4th 750 (5th Cir. 2024) ........................................................22

*Dias v. City & Cnty. of Denver*,
  567 F.3d 1169 (10th Cir. 2009) ....................................................42

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*,
  100 F.4th 1251 (10th Cir. 2024) ...................................................19

*Dubbs v. Head Start, Inc.*,
  336 F.3d 1194 (10th Cir. 2003) ....................................................31

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ........................................................32

*EEOC v. CollegeAmerica Denver, Inc.*,
  869 F.3d 1171 (10th Cir. 2017) ....................................................51

*FEC v. Akins*,
  524 U.S. 11 (1998) ......................................................................20

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ................................................................44

*Free the Nipple-Fort Collins v. City of Fort Collins*,
    916 F.3d 792 (10th Cir. 2019) ...................................... 4, 18, 43, 46, 47

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................23

*Garling v. EPA*,
    849 F.3d 1289 (10th Cir. 2017) .............................................................48

*Gerson v. Logan River Acad.*,
    20 F.4th 1263 (10th Cir. 2021) ...............................................................35

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ................................................................................50

*Goss v. Lopez*,
    419 U.S. 565 (1975) ................................................................................43

*Griffin v. Strong*,
    983 F.2d 1544 (10th Cir.1993) ...............................................................37

*Gruenke v. Seip*,
    225 F.3d 290 (3d Cir. 2000) ............................................................. 37, 38

*H.L. v. Matheson*,
    450 U.S. 398 (1981) ................................................................................35

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) .............................................................43

*Hodgson v. Minnesota*,
    497 U.S. 417 (1990) ................................................................................39

*Hollingsworth v. Hill*,
    110 F.3d 733 (10th Cir. 1997) ...............................................................42

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978) ..................................................................................51

*J.B. v. Washington Cnty.*,
  127 F.3d 919 (10th Cir. 1997) ...................................................................... 19, 42

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
  78 F.4th 622 (4th Cir. 2023)................................................................25

*Kadel v. Folwell,*
  100 F.4th 122 (4th Cir. 2024)..............................................................32

*Kitchen v. Herbert*,
  755 F.3d 1193 (10th Cir. 2014)............................................................40

*Koe v. Noggle,*
  No. 1:23-CV-2904-SEG,
  2023 WL 5339281 (N.D. Ga. Aug. 20, 2023)......................................32

*Lamb v. Norwood*,
  899 F.3d 1159 (10th Cir. 2018)............................................................32

*Larson v. Valente*,
  456 U.S. 228 (1982) .............................................................................50

*Lockhart v. United States*,
  577 U.S. 347 (2016) .............................................................................49

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................19

*Mahanoy Area Sch. Dist. v. B.L.*,
  141 S. Ct. 2038 (2021) .........................................................................36

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) .............................................................................43

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) .............................................................................35

*Mirabelli v. Olson*,
  691 F. Supp. 3d 1197 (S.D. Cal. 2023) ...............................................41

*Mirabelli v. Olson*,
  No. 3:23-CV-0768-BEN (VET),
  2025 WL 42507 (S.D. Cal. Jan. 7, 2025) ............................................36

*Monroe v. Meeks,*
   584 F. Supp. 3d 643 (S.D. Ill. 2022) ...................................................32

*Moore v. City of E. Cleveland,*
   431 U.S. 494 (1977) .........................................................................37

*Mueller v. Auker,*
   576 F.3d 979 (9th Cir. 2009) ............................................................39

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,*
   565 F.3d 683 (10th Cir. 2009) ................................................... 11, 45

*Nunez by Nunez v. City of San Diego,*
   114 F.3d 935 (9th Cir. 1997) ............................................................35

*Parents Defending Education v. Linn-Mar Community School District,*
   629 F. Supp. 3d 891 (N.D. Iowa 2022),
   *opinion vacated, appeal dismissed*, 83 F.4th 658 (8th Cir. 2023) .....................26

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.,*
   No. 23-1280,
   2024 WL 5036271 (U.S. Dec. 9, 2024)...............................................3

*Parents Protecting Our Children, UA v. Eau Claire Area School District,*
   95 F.4th 501 (7th Cir. 2024)...............................................................22

*Parents Un. For Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.,*
   148 F.3d 260 (3d Cir. 1998) ..............................................................22

*Parham v. J.R.,*
   442 U.S. 584 (1979) .......................................... 22, 22, 23, 30, 31, 41

*Patel v. Searles,*
   305 F.3d 130 (2d Cir. 2002) ..............................................................38

*People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.,*
   852 F.3d 990 (10th Cir. 2017) ...........................................................52

*Peterson v. Martinez,*
   707 F.3d 1197 (10th Cir. 2013) .........................................................53

*Pierce v. Soc'y of Sisters,*
   268 U.S. 510 (1925) ................................................................... 35, 37

*Pinson v. Hadaway,*
 No. 18-CV-3420-NEB-KMM,
 2020 WL 6121357 (D. Minn. July 13, 2020)......................................................32

*PJ ex rel. Jensen v. Wagner,*
 603 F.3d 1182 (10th Cir. 2010) ................................................................. 31, 34

*Reno v. Flores,*
 507 U.S. 292 (1993) .............................................................................................39

*Ricard v. USD 475 Geary Cnty., KS Sch. Bd.,*
 No. 522CV04015HLTGEB,
 2022 WL 1471372 (D. Kan. May 9, 2022) ................................................. 36, 41

*Riggs v. City of Albuquerque,*
 916 F.2d 582 (10th Cir. 1990)............................................................................20

*Rocky Mountain Gun Owners v. Polis,*
 685 F. Supp. 3d 1033 (D. Colo. 2023) ..............................................................48

*RoDa Drilling Co. v. Siegal,*
 552 F.3d 1203 (10th Cir. 2009)..........................................................................44

*Schmitz v. Colo. State Patrol,*
 841 F. App'x 45 (10th Cir. 2020).......................................................................48

*Sierra Club v. Franklin Cnty. Power of Illinois, LLC,*
 546 F.3d 918 (7th Cir. 2008)..............................................................................23

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) .............................................................................................19

*Stanley v. Illinois,*
 405 U.S. 645 (1972) .............................................................................................41

*Stewart v. Oklahoma,*
 292 F.3d 1257 (10th Cir. 2002)............................................................................4

*Summum v. Pleasant Grove City,*
 483 F.3d 1044 (10th Cir. 2007)
 *rev'd on other grounds sub nom.*, 555 U.S. 460 (2009)......................................48

*Swanson By & Through Swanson v. Guthrie Indep. Sch. Dist. No. I-L,*
   135 F.3d 694 (10th Cir. 1998) ...............................................................36

*T.F. v. Kettle Moraine School Dist.,*
   No. 2021CV1650,
   2023 WL 6544917 (Wis. Cir. Oct. 03, 2023) ......................................34

*Tandy v. City of Wichita,*
   380 F.3d 1277 (10th Cir. 2004) ............................................. 19, 20, 21

*Tennessee v. Cardona,*
   No. CV 2: 24-072-DCR,
   2024 WL 3019146 (E.D. Ky. June 17, 2024) .......................................36

*Thomas v. Kaven,*
   765 F.3d 1183 (10th Cir. 2014) ............................................................38

*Tirrell v. Edelblut,*
   No. 24-CV-251-LM-TSM,
   2024 WL 4132435 (D.N.H. Sept. 10, 2024) ........................................32

*Travis v. Gary Cmty. Mental Health Ctr., Inc.,*
   921 F.2d 108 (7th Cir. 1990) ...............................................................51

*Troxel v. Granville,*
   530 U.S. 57 (2000) .................................................. 30, 34, 35, 39, 41

*United States v. Bear,*
   769 F.3d 1221 (10th Cir. 2014) ...........................................................39

*United States v. Salerno,*
   481 U.S. 739 (1987) ..............................................................................42

*United States v. Wesley,*
   60 F.4th 1277 (10th Cir. 2023) ............................................................50

*Utah Licensed Beverage Ass'n v. Leavitt,*
   256 F.3d 1061 (10th Cir. 2001) ...........................................................48

*Vernonia Sch. Dist. 47 v. Acton,*
   515 U.S. 646 (1995) ..............................................................................36

*Ward v. Utah*,
321 F.3d 1263 (10th Cir. 2003) .................................................................. 20, 26

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees,*
680 F. Supp. 3d 1250 (D. Wyo. 2023) ............................................. 20, 21, 39, 42

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ...................................................................................... 35

**Statutes**

C.R.S. § 22-1-145(1)(a) .................................................................................. 9, 42

C.R.S. § 22-1-143(3)(c) .................................................................................... 45

C.R.S. § 24-34-601(2)(a) .................................................................................. 50

C.R.S. § 24-34-306(1)(b) .................................................................................. 52

**Rules**

3 Code Colo. Regs. 708-1, Rule 81.6(A)(4) ..................................................... 50

3 Code Colo. Regs. 708-1, Rule 10.8(A)(3) ..................................................... 52

**Other**

27J Schools, *District Policies*, available online at https://www.sd27j.org/about-us/district-policies (last visited Feb. 4, 2025)...................................................... 45

Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations
*Adams v. The School Board of St. Johns County*,
Case No. 18-13592 ........................................................................................ 33

Eappen, R., *Most 'Transgender' Kids Turn out to Be Gay*, Wall Street Journal (Dec. 14, 2023) .............................................................................................. 3

NCI Thesaurus, *Gender Identity Disorder*, available online at https://ncit.nci.nih.gov/ncitbrowser/pages/concept_details.jsf?dictionary=NCI_Thesaurus&version=24.08d&code=C94362&ns=ncit&type=properties&key=null&b=1&n=0&vse=null (last visited Feb. 4, 2025) ................................................ 11

Nondiscrimination in Health Programs and Activities, Proposed Rule, 87 FR 47,824-01, *47,867 (August 4, 2022) ...............................................................34

*The Cass Review*: *Independent review of gender identity services for children and young people*,
 Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024) ....33

*The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*,
 Zucker, Ken J., 19 International Journal of Transgenderism ..............................33

## 10th Cir. R. 28.2(C)(3) STATEMENT

Appellants are not aware of any prior or related appeals.

**INTRODUCTION**

The law of parent and child reflects one enduring principle: the best way to protect children from harm is to give their parents broad authority over them. Children are immature and make rash decisions, while parents are presumed to be fit and to act in their children's best interests. Parents' decisions are not always correct, of course, but the government must defer to those decisions in the absence of a compelling, narrowly tailored reason not to.

Rather than defer to parents, Colorado has transferred decision-making authority to children on a matter of grave importance in their lives—whether to undergo a social transition. In the school setting, a social transition occurs when the school addresses children by a new name and/or pronouns of their choice associated with their transgender identity. Social transitioning is a form of mental healthcare treatment in youth. Indeed, the very purpose of social transitioning is to alleviate the psychological distress that can accompany having a transgender identity. But social transitioning can change gender outcomes, making it more likely that a child's transgender identity persists into adulthood. And most children who undergo a social transition go on to transition medically—through puberty blockers, cross-sex hormones, and, for some, sex-reassignment surgeries. Accordingly, whether to undergo a social transition is not a choice children can make alone.

Yet under Colorado House Bill 24-1039 (the "Name Change Law" or "Law"), public schools must refer to schoolchildren—who could be as young as five years old—by a new name they chose as an expression of their asserted transgender identity. This obligation applies regardless of parents' wishes, and schools are not required to notify parents. Moreover, School District 27J a/k/a 27J Schools (the "District") has adopted policies (the "Parental Exclusion Policy" or "Policy") requiring schools to call students by the name and/or pronouns of their choice regardless of parents' wishes. In addition, the Policy provides that school personnel *may not tell parents* if their children say their parents are "not supportive" of the transition. Worse, the Policy requires school personnel to *deceive and lie* to allegedly "unsupportive" parents if they ask whether their children are being socially transitioned.

The Law and Policy are unconstitutional. Parents, not children, have the right to decide whether their children receive healthcare treatment. Parents, not children, have the right to make important decisions in their children's lives. And parents, not children, have the right to resist undue state interference with the fabric of the family.

Appellees argue the Law and Policy prevent discrimination against transgender-identifying children at school, but this argument ascribes far too much permanence to what, in children, is typically a temporary identity state. In years past, many transgender-identifying children would have simply grown up to realize they

were gay or lesbian. Today, schools are "transing the gay away"[1] through social transitions to devastating effect on these children's lives.

This case arises out of the District's secret social transition of the Does' oldest daughter, A.D. Despite the fact A.D.'s mental health quickly deteriorated after the transition, the District deceived the Does about its actions. After two years of being socially transitioned at school, A.D. stopped feeling like a boy. But her gender journey is not complete. A.D. still has ongoing struggles with her gender identity, and she has not yet figured out how to return to feeling like the girl she once was.

The Does sought a narrow preliminary injunction, seeking only to enjoin Appellees from applying the Law and Policy against A.D. and her younger sister, B.D. But the district court denied the Does' request for preliminary relief, concluding, primarily, that they lacked standing. That was legal error. Like other courts around the country, the district court "succum[ed] to the temptation [of using] the doctrine of Article III standing as a way of avoiding" the constitutional question the Does raise. *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, No. 23-1280, 2024 WL 5036271, at *1 (U.S. Dec. 9, 2024) (Alito, J., dissenting from denial of petition for certiorari).

---

[1] *See* Eappen, R., *Most 'Transgender' Kids Turn out to Be Gay*, Wall Street Journal (Dec. 14, 2023). App. 3 at 701–704.

This Court should resist that same temptation. The Does have standing, and because the record is fully developed, the Court should grant the Does the modest preliminary relief they seek.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On January 24, 2025, the district court entered an order (the "PI Order") denying the Does' motion for preliminary injunction. App. 4 at 880–901. That same day, the district court entered an order granting Attorney General Weiser's Rule 12(b)(1) motion to dismiss (the "AG Dismissal Order"). App. 4 at 902–906. On January 27, 2025, the Does appealed the PI Order. App. 4 at 907. On February 3, 2025, the Does filed an amended notice of appeal that also appealed the AG Dismissal Order. App. 4 at 908–09.

The PI Order is appealable under 28 U.S.C. § 1292(a)(1). *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 795 (10th Cir. 2019). The AG Dismissal Order is appealable under pendant appellate jurisdiction because it is "inextricably intertwined" with the PI Order and review of the AG Dismissal Order "is necessary to ensure meaningful review" of the PI Order. *Stewart v. Oklahoma*, 292 F.3d 1257, 1260 (10th Cir. 2002).

## ISSUES PRESENTED

1.      Did the district court err by concluding the Does failed to show a likelihood of success on the merits because they did not make a substantial showing of standing to seek prospective relief?

2.      Did the district court err by concluding the Does were not suffering irreparable harm?

3.      Did the district court err by concluding the balance of harms favored Appellees?

4.      Did the district court err by concluding a preliminary injunction is not in the public interest?

5.      Did the district court err by denying the Does preliminary injunctive relief?

6.      Did the district court err by concluding the Does failed to show a likelihood of success on the merits against the Attorney General and dismissing him based on sovereign immunity?

**STATEMENT OF THE CASE**

## I.    FACTUAL BACKGROUND

### A.    Background On Gender Dysphoria[2]

#### 1.    Gender Dysphoria and its Treatment in Minors

While it is not known exactly why transgender identities develop in some people, broad agreement exists that it is the result of a complex interplay between biological, psychological, and social factors. App. 2 at 546. Especially in minors, a person's gender identity can be fluid as the minor develops. App. 2 at 546–47, 556.

Gender dysphoria is a psychiatric condition in which a person's transgender identity causes clinically significant psychological distress. App. 2 at 539. While having a transgender identity is not a psychiatric condition, many transgender-identifying minors have gender dysphoria or sub-threshold psychological distress. App. 2 at 539, 549. Many also have other conditions such as autism, depression, anxiety, and ADHD. *Id.*

There are four general approaches to treating gender dysphoria in minors— "hands off," "watchful waiting," "psychotherapy," and "affirmation." App. 2 at 540. The "affirmation" model holds that a minor's expression of a transgender identity

---

[2] The facts set forth in this section are based on the Declaration of Dr. Erica Anderson. App. 3 at 532–79. Dr. Anderson, a transgender female, is a clinical psychologist in the field of gender-divergent youth. App. 3 at 535.

should be accepted as decisive and that the minor's psychological condition will improve with "affirmation" of that identity. *Id.*

## 2. Social Transitioning is a Form of Psychological Treatment

A primary pillar of the "affirmation" model is social transitioning. *Id.* In the school setting, social transitioning primarily means affirming minors' transgender identities by calling them a new name and/or pronouns associated with that identity. App. 2 at 539. The purpose of social transitioning is to alleviate psychological distress caused by the mismatch between a person's gender identity and sex. *Id.* Social transitioning is a form of psychological treatment. *Id.*

In minors, social transitioning is not a mere harmless exploration of gender identity. App. 2 at 554. Absent social transitioning, a large majority of transgender-identifying minors will lose their transgender identity—or "desist"—by adulthood. App. 2 at 546, 550. But when a child is socially transitioned, the rate of desistence plummets. App. 2 at 550. Thus, socially transitioning minors makes it more likely their transgender identity will persist. App. 2 at 550–55. Persistence in children who would otherwise desist is psychologically harmful to them. App. 2 at 569–70.

In the vast majority of cases, minors who are socially transitioned go on to receive future "affirmative" medical care in the form of puberty blockers, cross-sex hormones, and, for some, "affirming" surgeries, like mastectomies and genital removal. App. 2 at 559–60. Thus, before social transitioning is considered, the risks

associated with this "affirmative" medical care must be considered. *Id.* These risks are significant, and include bone weakness, depression, decreased sexual response, and sterility. *Id.*

Before a social transition is undertaken, every minor should receive a careful professional evaluation designed to evaluate the likelihood of persistence, among other things. App. 2 at 536, 546–549. Socially transitioning every minor who asks for it is a "one-size-fits-all" approach that fails to account for the unique issues the minor may be facing. App. 2 at 556–57. Instead of social transitioning, some minors simply need counseling to understand their feelings. *Id.* And it can be permissible for parents to say "no" to a social transition. App. 2 at 562. Indeed, there is no clear evidence social transitioning produces positive mental health outcomes in young children and there is only weak evidence of positive outcomes in adolescents. App. 2 at 556.

### 3. Parental Consent is Necessary to Socially Transition Minors

Parental involvement is necessary when minors are socially transitioned. App. 2 at 549, 562–65. Giving minors the power to make this choice on their own necessarily results in the ill-advised transition of some percentage of minors, leading to increased persistence and the serious consequences that can follow. App. 2 at 562. Indeed, no medical or psychological association has endorsed school-facilitated social transitions of minors without parental consent. App. 2 at 568.

Schools that socially transition minors in secret from their parents inflict additional harm. Doing so precludes parents from facilitating appropriate treatment for their children. App. 2 at 566. Doing so is inherently psychologically unhealthy because it causes minors secretly to inhabit different gender identities at home and school. App. 2 at 567. And doing so increases minors' sense that their parents are "the enemy," driving a wedge in the family just when parents are needed most. *Id.*

### B.    The Name Change Law and Parental Exclusion Policy

The Name Change Law went into effect on April 29, 2024. C.R.S. § 22-1-145, *et seq.* Under the Law, schools must refer to students by a name they chose that "reflect[s their] gender identity." C.R.S. § 22-1-145(1)(a). This obligation applies regardless of parents' wishes, and schools are not required to notify parents. *Id.*

The District is based in Brighton, Colorado. App. 3 at 773. Today, it has several policies and procedures comprising its Parental Exclusion Policy—Name Changes: ACA, Bullying Prevention and Education Policy: JICDE, and the 2024 LBGTQ+ Toolkit. App. 3 at 585–86, 617–18, 860–79. Under the Policy, if a child asks to go by a new name and/or pronouns associated with their transgender identity, a school counselor will meet with the child to create a Gender Support Plan. App. 3 at 868. The Gender Support Plan allows the District to facilitate the child's social transition throughout the school environment. App. 2 at 520–24, App. 3 at 868. The

Policy requires all District personnel and other students to call the child by his or her new name and/or pronouns. App. 3 at 585, 617, 867–68.

Like the Law, the Policy applies regardless of parents' wishes. App. 3 at 617, 867–68. Moreover, unless the child expressly agrees to parental notification, the school will not inform the child's parents of the transition if the child asserts his or her parents are "not supportive" of it. App. 3 at 782; *see also* District Opp'n to Pls.' Mot. for Prelim. Injunc. (ECF 25) at 6 n.3, 24. Instead, the Policy requires District personnel to conceal the transition from these parents, including by "us[ing] the [child's] legal name and the pronoun corresponding to the student's [sex]" in communications with parents while calling the child by a new name and/or pronouns at school. App. 3 at 875. Further, if allegedly "unsupportive" parents ask the school whether their children are being socially transitioned, District personnel must deceive and lie to the parents. App. 3 at 783, 875; *see also* Sealed App. at 912.

### C. The District Socially Transitions A.D. At School[3]

#### 1. A.D.'s middle school

In 2019, when A.D. was in the 6th grade, she began having mental health struggles. App. 3 at 783. Around that time, she also began experiencing a transgender

---

[3] In adjudicating the Does' motion for preliminary injunction, the district court relied on the allegations in the FAC, not the original Complaint. App. 4 at 884 n.5. The Does do the same here.

identity. *Id.* Over the years, A.D. has been treated for various psychological conditions, including depressive disorder, mood disorder, and gender identity disorder. App. 3 at 783–84.[4]

When A.D. was in the 8th grade, she told a school counselor she wanted to go by non-female pronouns and that her parents were not supportive of her doing so. App. 3 at 784–85. With A.D.'s permission, the counselor entered a "pronoun flag" in A.D.'s profile on the school's computer database, called Infinite Campus. *Id.* The purpose of the "pronoun flag" was to alert other District personnel that A.D. was to be known by non-female pronouns and that the Does should not be told. *Id.*[5]

---

[4] "Gender Identity Disorder" is a psychiatric condition "characterized by a strong and persistent cross-gender identification . . . coupled with persistent discomfort with [one's] sex." *See* NCI Thesaurus, *Gender Identity Disorder*, available online at https://ncit.nci.nih.gov/ncitbrowser/pages/concept_details.jsf?dictionary=NCI_Thesaurus&version=24.08d&code=C94362&ns=ncit&type=properties&key=null&b=1&n=0&vse=null (last visited Feb. 4, 2025). The Court should take judicial notice of this definition under Federal Rule of Evidence 201 because it comes from a government website. *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009).

[5] A.D.'s recollection is that she did not ask to change her pronouns until she was in the 9th grade, App. 3 at 784–85. For purposes of this appeal, however, the Does do not dispute the district court's finding that this occurred in the 8th grade. App. 4 at 884. The timing of when A.D. first asked to begin going by non-female pronouns is not material to this appeal.

### 2.  A.D.'s freshman year

In 2022, early in A.D.'s freshman year in high school, she began seeing a school counselor regarding her mental health struggles. App. 3 at 785. A.D. informed the counselor she had a transgender identity and that she wanted to go by "Z.D.," a boy's name. App. 3 at 785–86. A.D. asked the counselor not to change her profile in Infinite Campus so her parents could not find out about her new name. App. 3 at 786. From that point forward, A.D. was known as Z.D. at school. *Id.*

The counselor later created a Gender Support Plan for A.D. App. 3 at 613; *see also* Sealed App. at 910–17. Among other things, the Gender Support Plan instructed school personnel that, if the Does asked whether A.D. was being socially transitioned, they were not to tell them the truth but to respond by saying "We're following the legal practice with your student." Sealed App. at 912. The District did not share the Gender Support Plan with the Does. App. 3 at 613.

A.D.'s mental health struggles worsened during her freshman year, but District personnel did not inform the Does about the transition. App. 3 at 788. Instead, District personnel concealed the transition from the Does, referring to A.D. as "A.D." and by female pronouns in conversations with the Does despite referring to her as "Z.D." and by non-female pronouns at school. *Id.*

In March 2023, the spring of A.D.'s freshman year the Does learned A.D. was experiencing a transgender identity. *Id.* Mrs. Doe told the counselor she did not want

A.D. to be socially transitioned. App. 3 at 789. The counselor did not inform Mrs. Doe that A.D. was already being socially transitioned, and the school continued the transition against Mrs. Doe's wishes. *Id.* During this time, A.D.'s relationship with her parents worsened because she wanted to start testosterone and have a mastectomy, but the Does would not consent. App. 3 at 769, 790.

### 3. A.D.'s sophomore year

In March 2024, the spring of A.D.'s sophomore year, she informed her parents she no longer identified as a boy. *Id.* In May 2024, A.D. asked a school counselor to change her Infinite Campus profile back to female pronouns. *Id.* At that time, however, A.D. did not ask her teachers to stop calling her "Z.D." or referring to her with non-female pronouns, and her teachers continued to refer to her that way the rest of her sophomore year. *Id.*

### 4. A.D.'s junior year

In August 2024, at the beginning of A.D.'s junior year, her new teachers started calling her "A.D." and referring to her with female pronouns, consistent with her Infinite Campus profile. App. 3 at 791. When A.D. encountered her prior teachers, some of them referred to her as "Z.D." and with non-female pronouns. *Id.* A.D. has told some—though not all—of her prior teachers that she now goes by "A.D." and uses female pronouns. *Id.* A.D. intends to inform the rest of her prior teachers of the change when she feels the time is right. *Id.*

A.D. now believes her mental health struggles and uncertainty regarding her sexual orientation caused her to have a transgender identity. App. 3 at 768, 791. But it is too early to say that A.D.'s transgender identity has desisted. App. 3 at 792. While A.D. no longer feels like a boy, she is still struggling with her gender identity, and there is a part of her that does not yet feel comfortable in a female body. *Id.* A.D. is trying to understand those feelings and get back to her prior self, but she has not yet figured out how to do that. *Id.* These struggles are likely to last into A.D.'s adulthood. App. 3 at 770.

## II.    PROCEDURAL HISTORY

On August 7, 2024, before the beginning of A.D.'s junior year, the Does filed their Complaint. ECF 1. That same day, the Does filed their motion for preliminary injunction. ECF 2.

On October 22, 2024, the Does filed a First Amended Verified Complaint ("FAC"). App. 3 at 767–805. Appellees each filed Rule 12 motions to dismiss the FAC. ECF 61–63.

On January 24, 2025, the district court entered the PI Order and AG Dismissal Order. App. 4 at 880–906. To date, the district court has not yet ruled on the other Appellees' motions to dismiss.

On January 27, 2025, the Does appealed the PI Order. App. 4 at 907. On February 3, 2025, the Does appealed the AG Dismissal Order. App. 4 at 908–09.

Due to the ongoing violation of the Does' constitutional rights and the serious risk of harm to their children, they have filed a motion to expedite this appeal. Dkt. 10.

## SUMMARY OF THE ARGUMENT

1.     The district court erred in concluding it was not substantially likely that the Does have standing. First, the Does are suffering ongoing injury. Parents have the right to obtain truthful information from their children's school, and the Policy's requirement that District personnel deceive and lie to parents precludes the Does from knowing whether their children are being socially transitioned. Moreover, the Law and Policy impermissibly alter the constitutionally mandated decisional framework under which parents—not children—make the important decisions in their children's lives. Further, the Does must alter their behavior to combat the impact of the Law and Policy on their children.

Second, the Does are subject to the risk of future injury. A.D. only recently de-transitioned at school, and she is still struggling with her gender identity. In addition, B.D. is subject to peer and other outside pressures to adopt a transgender identity. On these facts, there is a realistic danger the Does' children will (again) seek to be socially transitioned at school in the relatively near future.

Moreover, the Does have made a substantial showing that the Law and Policy infringe their parental rights. First, schools that socially transition children upon their

request violate their parents' right to consent to healthcare treatment the government provides their children. Second, schools that socially transition children upon their request violate their parents' right to consent when the government makes important decisions in their children's lives. Third, schools that socially transition children upon their request unduly interfere with their parents' right to the integrity of their family. And fourth, the Law and Policy fail to provide parents the most basic procedural safeguards—notice and an opportunity to be heard—before their children are socially transitioned at school.

Strict scrutiny applies, and Appellees' argument that the Law and Policy prevent discrimination against transgender-identifying children at school is unavailing. This argument ascribes far too much permanence to what, in children, is typically a temporary identity state. Moreover, socially transitioning every child who asks for it without parental consent or notice is not narrowly tailored and flips the constitutionally mandated presumptions of fitness and affection on their head. For these same reasons, the Law and Policy would fail even rational basis review.

2.     The district court erred in concluding the Does' delay undermines their assertion of irreparable harm. Appellees did not make this argument, and, thus, they made no showing of prejudice. Moreover, the Does did not delay. There is no evidence the Does were even aware of the unlawful provisions of the Policy before

filing suit, and in any event, they filed suit before A.D. even fully de-transitioned at school.

3.     The district court erred in concluding the balance of harms tilts in favor of Appellees. The district's court's other errors caused it to err here too.

4.     The district court erred in concluding the Does' proposed preliminary injunction was not in the public interest. The district court's other errors caused it to err here too.

5.     Because all the preliminary injunction factors weigh in the Does' favor, the district court erred in denying their motion for preliminary injunction. Moreover, the record is well-developed and there are only minor factual disputes, so this Court should reverse with instructions for the district court to enter a preliminary injunction.

6.     The district court erred in concluding the Does were not likely to succeed on the merits against the Attorney General and in dismissing him based on sovereign immunity. The district court erroneously failed to construe the FAC to seek prospective relief against the Attorney General's enforcement of the Colorado Anti-Discrimination Act ("CADA"), and the Attorney General is a proper defendant in connection with such relief under *Ex Parte Young*.

**ARGUMENT**

**STANDARD OF REVIEW**

This Court reviews the PI Order for abuse of discretion. *Free the Nipple*, 916 F.3d at 797. The district court abuses its discretion when it commits an error of law or makes clearly erroneous factual findings. *Id.*

This Court reviews the AG Dismissal Order de novo. *Colo. Envtl. Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004).

## I. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE DOES ARE NOT SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS

A preliminary injunction is appropriate when plaintiffs demonstrate four factors weigh in their favor: (1) they are "substantially likely to succeed on the merits"; (2) they will suffer "irreparable injury" without an injunction; (3) their "threatened injury (without the injunction) outweighs the opposing party's under the injunction"; and (4) the injunction is not "adverse to the public interest." *Free the Nipple*, 916 F.3d at 797 (cleaned up).

The Does are substantially likely to prevail on the merits. They have standing, and the Law and Policy violate their constitutional rights.

### A. It is substantially likely the Does have standing

To satisfy Article III, plaintiffs must establish (1) an injury-in-fact (2) traceable to the defendant's actions that (3) can be redressed through the requested


relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). When evaluating standing, the Court "must assume . . . that each claim is legally valid." *Citizen Center v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014).

Here, the district court concluded the Does did not establish an injury-in-fact. App. 4 at 892–99. "[I]ntangible harms," such as the loss of a constitutional right, can constitute injury-in-fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (cleaned up); *see also J.B. v. Washington Cnty.*, 127 F.3d 919, 928 (10th Cir. 1997) (holding standing exists to challenge loss of parental right).

To establish an injury-in-fact sufficient to obtain prospective relief, the plaintiff must either (1) be "suffering a continuing injury" that is currently ongoing or (2) be "under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). Plaintiffs suffer a continuing injury when they are suffering ongoing harm. *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1266 (10th Cir. 2024) (concluding plaintiff's continued unemployment was ongoing harm). Plaintiffs establish future injury when there is a "realistic danger" they will be injured "in the relatively near future." *California v. Texas*, 593 U.S. 659, 670 (2021) (cleaned up); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 2011 (1995); *see also Cache Valley Elec. Co. v. Utah Dep't of Transp.*, 149 F.3d 1119, 1122 (10th Cir. 1998). While past wrongs alone do not establish future injury, "[p]ast wrongs are evidence [of] . . . [future] injury." *Tandy*, 380 F.3d

at 1285; *see also Riggs v. City of Albuquerque*, 916 F.2d 582, 586 (10th Cir. 1990). And past wrongs establish future injury when accompanied by "continuing, present adverse effects." *Ward v. Utah*, 321 F.3d 1263, 1269 (10th Cir. 2003).

The Does have standing to seek injunctive relief because the Law and Policy are both currently injuring them and are likely to injure them in the future.

1. The Does are suffering continuing injury.

The Does are suffering continuing injury. This injury is occurring regardless of whether their children ever seek (again) to be socially transitioned.

*a. The Policy precludes the Does from obtaining truthful information about their children.*

The Does are currently suffering injury because the Policy precludes them from obtaining information to which they are entitled under the constitution. Parents have the right to obtain information from schools about significant acts schools are performing on their children. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees,* 680 F. Supp. 3d 1250, 1277 (D. Wyo. 2023). Accordingly, parents have standing to challenge school policies that prevent them from obtaining information about whether their children are being socially transitioned. *Id.*; *see also FEC v. Akins*, 524 U.S. 11, 21 (1998) (holding standing exists where plaintiff alleges the "inability to obtain information . . . that, on [plaintiff's] view of the law" must be disclosed); *Citizen Ctr.*, 770 F.3d at 916 (similar).

The Policy precludes the Does from obtaining this information. It requires District personnel to deceive and lie to parents in response to a direct question regarding whether their children are being transitioned. App. 3 at 783; *see also* Sealed App. at 912. The Does "intend to seek . . . information [from the District regarding whether their children are being socially transitioned]." App. 3 at 795. Yet despite trying, the Does will be unable to obtain this information because they have no way of knowing if the District's response is truthful. The Does thus have standing to seek prospective relief against the Policy. *Willey,* 680 F.Supp.3d at 1277.

The district court concluded the Does were not suffering continuing injury because they did not allege they had ever requested such information in the past. App. 4 at 894. But this conclusion confuses retrospective injury with prospective injury. Retrospective injury—which is necessary to recover damages—asks whether the plaintiff suffered a "past injury." *Tandy*, 380 F.3d at 1283. By contrast, prospective injury—which is necessary to obtain an injunction—asks whether the plaintiff is suffering a "continuing injury" or is under the threat of "future [injury]." *Id*. While retrospective injury may make the existence of prospective injury more likely, it is not required to seek prospective relief. *Id.*

The district court cited *Parents Protecting Our Children, UA v. Eau Claire Area School District* in support of its conclusion, App. 4 at 894–95, but the district court misread that case. There, the policy at issue was a new policy that had never

been applied to any student, and the record was unclear how it would operate in practice. 95 F.4th 501, 505–06 (7th Cir. 2024) (holding parents lacked standing because "[a]ll we have before us is a policy on paper without concrete facts about its implementation"), *cert. denied*, No. 23-1280, 2024 WL 5036271 (U.S. Dec. 9, 2024). Here, by contrast, the Policy has already been applied against A.D. and there is no ambiguity over how it works. *Eau Claire* is inapposite.

> b. *The Law and Policy alter the constitutionally required decisional framework.*

The Does are currently suffering injury because the Law and Policy impermissibly alter the constitutionally required framework under which parents have decision-making authority over their children. As the Supreme Court has held, the state may not "transfer the power" to make major decisions in children's lives away "from . . . parents" without sufficient justification. *Parham v. J.R.*, 442 U.S. 584, 603 (1979). The Law and Policy, however, create a regime under which children may decide—on their own—whether to undergo a social transition. This framework usurps parental authority even if the Does' children never seek to be socially transitioned under it. *See Deanda v. Becerra*, 96 F.4th 750, 757 (5th Cir. 2024) (holding father had standing to challenge contraception distribution program that "over[rode his] parental rights" despite no allegation his children sought to obtain contraceptives); *Parents Un. For Better Schs., Inc. v. Sch. Dist. of Phila. Bd. of Educ.*, 148 F.3d 260, 275 (3d Cir. 1998) (allowing parents to challenge school

condom distribution program despite no allegation children sought to obtain condoms); *see also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (holding plaintiff had standing to challenge law that denied its "alleged prerogative" to make decision).

The district court rejected this theory of standing because "there is no indication that the Law or [Policy] provide *the District* with any decision-making power." App. 4 at 895 (emphasis added). According to the district court, "*the District* is not the decision maker at issue: *the student* is." *Id.* (emphases added). But this conclusion confirms standing exists. It does not matter *to whom* the Does' decision-making authority is transferred; the point is that the Law and Policy transfer this authority *away from the Does*, where the constitution requires that it must reside in the first instance. *Parham*, 442 U.S. at 603.

> *c.  The Law and Policy require the Does to modify their behavior to combat their influence.*

The Does are currently suffering injury because they are required to "curtail their [behavior]" in response to the Law and Policy. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000); *see also Clements v. Fashing*, 457 U.S. 957, 962 (1982) (holding standing exists where plaintiffs were required to change their behavior); *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 926 (7th Cir. 2008) (similar). To counter the influence of the Law and Policy on their children, the Does are required, among other things, to "speak with

their children about gender-identity related issues they otherwise would not discuss" and "monitor their children's activities at school more closely than they otherwise would." App. 3 at 796. These behavioral modifications constitute ongoing harm.

The district court concluded this theory of injury was insufficient because "there is no reasonable causal connection between these alleged behavioral shifts and the Law and [Policy]." App. 4 at 896. This conclusion was erroneous. The Does were required to undertake these behavioral modifications to combat the influence of the Law and Policy on their children. App. 3 at 796. The district court also suggested that these behavioral modifications were not "harmful" to the Does. App. 4 at 896. But the Does—not the district court—are the judge of their relationships with their children. The Does contend these behavioral modifications are harmful to their relationship with their children, and the district court erred in failing to credit those allegations.

### 2. The Law and Policy will injure the Does in the future.

The Does are also suffering the threat of future injury that their right to consent to and notice of their children's social transition will be violated if their children seek to undergo a social transition in the future. This risk is particularly acute with respect to A.D. While A.D. presently identifies as a girl and has taken steps toward de-transitioning, "it is too early to say that her transgender identity has desisted."

App. 3 at 792. Instead, the facts establish A.D. is likely to continue to struggle with

her gender identity for the foreseeable future:

- In youth, coming to have a gender identity can be a process, and A.D. only recently began feeling like a girl again after approximately five years of first feeling like a boy. App. 3 at 793.

- A.D. has gone through other periods—like this one—where she has not felt like a boy, yet that feeling returned. *Id.*

- A.D. is still suffering from the conditions that likely triggered her transgender identity, a fact that makes its reappearance likely. *Id.*

- A.D. was socially transitioned at school for two years, a fact that makes it likely her transgender identity will persist. *Id.*

- There is a part of A.D. that does not yet feel comfortable in a female body, and she is still trying to understand those feelings and get back to her prior self. App. 3 at 792. A.D. is likely to continue to struggle with these feelings into adulthood. App. 3 at 770.

- The social pressures on A.D. to re-identify as a boy are intense. App. 3 at 793. A.D.'s friend group includes many children who identify as LGBTQ+, and District personnel create an enticing environment for students to socially transition at school. *Id.*

On these facts, there is a "realistic danger" A.D. will seek to re-transition "in the

relatively near future." *California*, 593 U.S. at 670; *Adarand Constructors*, 515 U.S.

at 211; *see also John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th

622, 629 (4th Cir. 2023) (noting that standing would have existed if parents had

alleged their children were "struggling with issues of gender identity"). Indeed,

because the District's prior social transition of A.D. contributed to the perpetuation

of her transgender identity, App. 3 at 791, the Does are suffering "continuing, present adverse effects" from the District's prior acts, *Ward*, 321 F.3d at 1269. These adverse effects put the Does' parental rights at risk of future violation.

The district court found that "A.D. stopped using [non-female] pronouns and the name Z.D. in March 2024, and the Law went into effect afterwards, on April 29, 2024, meaning that [the Does] are challenging a law that has not yet been applied to their children." App. 4 at 893. This finding was clearly erroneous. There is no dispute that A.D.'s "teachers continued referring to her as 'Z.D.' and with non-female pronouns" through "the end of A.D.'s sophomore year," which ended *after* the Name Change Law went into effect. App. 3 at 790. Moreover, while A.D. started her junior year going by "A.D." and using female pronouns, some of A.D.'s teachers from her freshman and sophomore year still know her as "Z.D." App. 3 at 791. While these facts are not necessary to conclude the Does have standing, the recency of these events highlights A.D.'s precarious position.

The district court cited *Parents Defending Education v. Linn-Mar Community School District* in support of its conclusion, but that case is distinguishable. There, the children in question had not previously been socially transitioned, and the parents alleged only that the policy at issue "could potentially" implicate their children. 629 F. Supp. 3d 891, 901, 903 (N.D. Iowa 2022), *opinion vacated, appeal dismissed*, 83

F.4th 658 (8th Cir. 2023). Here, the facts supporting the inference of future injury are far more compelling.

There is also a realistic danger that B.D. will seek to be socially transitioned in the relatively near future. The District is "encouraging" B.D. and other students in her class to "evaluate whether they feel like they might [have a transgender identity]" despite the fact B.D. is "too immature to process" that information. App. 3 at 794–95. Moreover, B.D. faces pressure from both her friend group and District personnel to identify as a boy. *Id.* On these facts, there is a realistic danger that B.D., like her older sister, will seek to be socially transitioned in the relatively near future.

The district court concluded the Does did not face the prospect of future injury because their children did not have "concrete plans" to socially transition at school. App. 4 at 893, 897 (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016)). But while the "concrete plans" standard may be appropriate to assess standing when the plaintiff alleges an intent to perform some act that is made unlawful by a law he seeks to challenge, *Hickenlooper*, 823 F.3d at 551, it is not appropriate where, as here, application of the challenged law is likely in the absence of "concrete plans." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (noting that standing jurisprudence does not "require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about"). Instead, the Does must only establish the existence of a "realistic danger"—or a "substantial

risk"—of future injury. *California*, 593 U.S. at 670; *Clapper*, 568 U.S. at 414 n.5. They have done so.

The district court also erred in concluding the Does lacked standing because they did not establish that their children would "ask the District to not include [their] parents in the [social transition] process." App. 4 at 897. The FAC *expressly* makes this allegation. App. 3 at 794, 795. Moreover, because the Does primarily contend the Law and Policy violate their right to *consent* when their children are socially transitioned at school, whether the Does' children will seek to exclude their parents is immaterial. Even if the Does' children authorized parental notice, the Does would still have standing to challenge the violation of their right to consent.

The district court also erred in disregarding the fact that the Does' children are subject to peer and other pressures. App. 4 at 897–98. According to the district court, this fact was irrelevant because the Law and Policy only protect social transitions that are based on a child's transgender identity, not outside pressures. *Id.* But this conclusion fundamentally misconstrues the Does' argument. The Does do not contend their children are subject to outside pressures *to change their name*. Rather, they contend their children are subject to outside pressures that can contribute to them *coming to have a transgender identity*. App. 3 at 793–94. These pressures, combined with the other facts tending to show the Does' children are

likely to seek to be socially transitioned at school, are sufficient to establish future injury.

The district court relied on the result in *Clapper* to conclude there was no threat of future injury, but *Clapper* is inapposite. There, human rights organizations asserted the Foreign Intelligence Surveillance Act violated their Fourth Amendment rights because it authorized the government to record phone calls with potential terrorists without a warrant. 568 U.S. at 401–02. The organizations presented no evidence that the government had recorded any such phone calls in the past, nor did they identify who the alleged terrorists were. In evaluating whether the organizations had standing, the Court noted that the "standing inquiry [is] especially rigorous" in cases involving allegations that "an action taken by one of the other two branches of the Federal Government was unconstitutional," particularly "in the fields of intelligence gathering and foreign affairs." *Id.* at 408–09. Applying this heightened standard, the Supreme Court held standing was lacking because the organizations relied on a "highly attenuated chain of possibilities" that the government *might* target some unknown terrorist's phone conversations with the organizations for recording under the Act. 568 U.S. at 410 (listing chain of five speculative inferences).

To describe *Clapper* is to distinguish it. Unlike *Clapper*, this case does not involve intra-branch disputes within the federal government, nor does it involve intelligence gathering or foreign affairs. Further, the Does do not assert a highly

attenuated chain of possibilities. Instead, they assert that something that has already happened is likely to happen again based on reasonable inferences from the facts at issue.

Finally, although the district court did not address causation and redressability, they are present here. The Law and Policy are causing the Does' injuries, which would be redressable by an order enjoining their enforcement. *See also infra* at 51. Accordingly, the Does have standing.

### B.    The Does are substantially likely to prevail on their claims.

Parents have a "fundamental right" to direct the "care, custody, and control" of their minor children. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.); *Arredondo v. Locklear*, 462 F.3d 1292 (10th Cir. 2006). This right arises under both the substantive component of the Due Process Clause, *Arredondo*, 462 F.3d at 1297, and the First Amendment's concept of "intimate association," *Bd. of Dir. of Rotary Intern. v. Rotary Club*, 481 U.S. 537, 545 (1987). The right rests on the common-law presumptions that (1) "parents possess what a child lacks in maturity, experience, and capacity for judgment" and (2) the "natural bonds of affection lead parents to act in the best interests of their children." *Parham*, 442 U.S. at 602. Applying these principles, the Law and Policy are unconstitutional.

1. <u>The Law and Policy infringe the Does' parental rights</u>

    a. *Parents have the right to consent when the government provides healthcare treatment to their children.*

Parents have the right to consent when the government provides healthcare treatment to their children. *See Parham*, 442 U.S. at 602 ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment."); *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010) (concluding that the constitution protects "parents' decisions regarding their children's medical care"); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (noting parents' "right to control the upbringing, including the medical care, of a child"); *see also Colon v. Collazo*, 729 F.2d 32, 34 (1st Cir. 1984) (holding parents have right to make mental healthcare decisions for minor children).

As Dr. Anderson explained in her Declaration, social transitioning is a form of healthcare treatment. App. 2 at 539. While it is unlike many other forms of healthcare treatment—like traditional forms of psychotherapy, pharmaceuticals, or an injection—it is treatment nonetheless:

- The purpose of social transitioning is to "alleviate the psychological distress" that can be "caused by the mismatch between one's natal sex and gender identity." *Id.*

- Social transitioning is a "primary pillar" of the affirmation model of treatment. App. 2 at 540.

31

- Adherents of the affirmation model hold the view that the child's "psychological condition will improve with 'affirmation'" through social transition. *Id.*

- Like other forms of psychological treatment, a social transition is not without risks. Because of the "psychological difficulty" of de-transitioning, social transitioning decreases the odds of desistence. App. 2 at 553–54. Moreover, social transitioning almost invariably leads to future "affirmative" medical care, the risks of which are significant. App. 2 at 537, 559.

Indeed, this Court has already concluded social transitioning constitutes a form of healthcare treatment. *Lamb v. Norwood*, 899 F.3d 1159, 1161 (10th Cir. 2018) (noting that "[t]reatment forms [for gender dysphoria] currently include . . . living . . . in another gender role, consistent with one's gender identity"). Courts throughout the country have arrived at the same conclusion. *Kadel v. Folwell*, 100 F.4th 122, 136–37 (4th Cir. 2024); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 770 (9th Cir. 2019); *Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 4132435, at *2 (D.N.H. Sept. 10, 2024); *Clark v. Quiros*, No. 3:19-CV-575 (VAB), 2024 WL 3552472, at *6 (D. Conn. July 26, 2024); *Koe v. Noggle*, No. 1:23-CV-2904-SEG, 2023 WL 5339281, at *6 (N.D. Ga. Aug. 20, 2023); *Monroe v. Meeks*, 584 F. Supp. 3d 643, 678 (S.D. Ill. 2022); *Pinson v. Hadaway*, No. 18-CV-3420-NEB-KMM, 2020 WL 6121357, at *1 (D. Minn. July 13, 2020).

Moreover, other experts view social transitioning as a form of healthcare treatment. In April 2024, Dr. Hilary Cass released the final version of her long-awaited evidence review assessing the safety and efficacy of the "affirmational"

method of care in minors. *See The Cass Review: Independent review of gender identity services for children and young people*, Dr. Hilary Cass, United Kingdom National Health Service (April 10, 2024). App. 1 at 042–App. 2 at 430. As Dr. Cass concluded, social transitioning is "an active intervention" in the life of minors "because it may have significant effects . . . in terms of [minors'] psychological functioning and longer-term outcomes." App. 1 at 200.

Dr. Ken Zucker, a leading clinician in the field, has opined that social transitioning is a form of "psychosocial treatment that will increase the odds of long-term persistence." Zucker, Ken J., *The myth of persistence: Response to "A Critical Commentary on Follow-Up Studies and Desistance Theories about Transgender and Gender Non-Conforming Children" by Temple Newhook et al.*, 19 International Journal of Transgenderism. App. 2 at 439.

In addition, many leading medical associations—including but not limited to the American Medical Association, the American Academy of Pediatrics, and the Endocrine Society—view social transitioning as "an important part of treatment." Br. of Amici Curiae Medical, Nursing, Mental Health, and other Health Care Organizations in Support of Appellee in *Adams v. The School Board of St. Johns County*, Case No. 18-13592. App. 2 at 477. And the United States Department of Health and Human Services has observed that a social transition can, in certain cases, be the "clinically indicated next step for [a gender non-conforming] child."

Nondiscrimination in Health Programs and Activities, Proposed Rule, 87 FR 47,824-01, *47,867 (August 4, 2022). On these facts, there is no reasonable dispute that social transitioning is a form of psychological treatment.

Because social transitioning is a form of treatment, schools must obtain parental consent before socially transitioning their children at school. *T.F. v. Kettle Moraine Sch. Dist.*, No. 2021CV1650, 2023 WL 6544917, at *5 (Wis. Cir. Oct. 03, 2023) (holding socially transitioning child without parental consent "directly implicates an infringement against the parental . . . right to direct the care for their child").

To be sure, while the parental right "reside[s] first" in the parents, *Troxel*, 530 U.S. at 65 (plurality op.), the government may provide healthcare treatment to children without parental consent under its *parens patriae* authority "when a child's life [or health] is under immediate threat." *Jensen*, 603 F.3d at 1198. But neither the Law nor Policy require schools to make this finding before socially transitioning them at school. Moreover, unlike an emergency situation, social transitioning is a slow, deliberative processes in which seeking parental consent is always feasible. Accordingly, the Law and Policy are unconstitutional.

> *b. Parents have the right to consent when the government makes important decisions in the lives of their children.*

Even if social transitioning were not healthcare treatment (and it is), the Law and Policy violate the Does' right to consent when the government makes "important

decisions" in their children's lives. *H.L. v. Matheson*, 450 U.S. 398, 411 (1981); *see also Gerson v. Logan River Acad.*, 20 F.4th 1263, 1280 (10th Cir. 2021) (noting "[p]arents can and must make many decisions on behalf of their children" (cleaned up)). Parents have the "primary role" in raising their children, *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972), and the Constitution protects those decisions that go to the "heart of parental decision-making," *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005). Among the decisions courts have held are protected include decisions regarding child visitation, *Troxel*, 530 U.S. 57, whether to send children to private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), the subjects children can be taught, *Meyer v. Nebraska*, 262 U.S. 390 (1923), whether children can go out in public at night, *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 952 (9th Cir. 1997), and whether children have access to birth control at school, *Alfonso v. Fernandez*, 606 N.Y.S.2d 259, 265–66 (N.Y. App. Div. 1993).

The decision whether to socially transition a child falls squarely within these precedents. As noted, that decision has significant consequences that are both immediate and that are likely to send reverberations throughout the child's life course. App. 2 at 550–556, 559–60. Because of the consequential nature of this decision, and because children are too immature to make it on their own, App. 2 at 562–67, the decision "reside[s] first" in parents, *Troxel*, 530 U.S. at 65 (plurality op.); *see also Mirabelli v. Olson*, No. 3:23-CV-0768-BEN (VET), 2025 WL 42507,

at *11 (S.D. Cal. Jan. 7, 2025) (holding that socially transitioning a child at school without parental consent violates "the long-recognized federal constitutional rights of parents"); *Tennessee v. Cardona*, No. CV 2: 24-072-DCR, 2024 WL 3019146, at *30 (E.D. Ky. June 17, 2024) (holding that "parents retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors"); *Ricard v. USD 475 Geary Cnty., KS Sch. Bd.*, No. 522CV04015HLTGEB, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) (noting that parents "have [the right to] have a say in what [their] minor child[ren are] called" by their school).

Importantly, socially transitioning students at school without parental consent does not fall within the scope of schools' implied authority under the *in loco parentis* doctrine. Under that doctrine, schools have "inferred parental consent" that gives them "a degree of authority . . . commensurate with the task that the parents ask the school to perform"—namely, to educate their children. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2052 (2021) (Alito, J., concurring); *see also Vernonia Sch. Dist. 47 v. Acton*, 515 U.S. 646 (1995). And because parents have impliedly delegated this slice of their parental authority to schools, parents "do not have a constitutional right to control each and every aspect of their children's education." *Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir. 1998)

(holding parental right does not include authority to send child to public school on a part-time basis).

But socially transitioning students is not within the scope of that inferred delegation. Instead, parents retain the right to decide whether children are socially transitioned at school, just as parents retain the right to decide their children's religious upbringing despite sending their children to public school. *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987) ("Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance [religion.]"). As the Supreme Court held a century ago, the state's authority to educate children does not turn them into "mere creature[s] of the state." *Pierce*, 268 U.S. at 535.

In short, parents' rights do not stop at "the schoolhouse door." *C.N.*, 430 F.3d at 185 n.6. "It is not educators, but parents who have primary rights in the upbringing of children," *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000), and parents cannot play this crucial role in the lives of their children if schools are facilitating children's social transition without parental consent.

> c. *Parents have the right to maintain the integrity of their family.*

The Law and Policy also infringe the Does' right to "family integrity." *Griffin v. Strong*, 983 F.2d 1544, 1549 n.6 (10th Cir.1993); *see also Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977) (plurality op.). This aspect of the parental right

protects parents against state action that constitutes an "unwarranted intrusion" in the parent-child relationship. *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014).

Socially transitioning children without obtaining parental consent constitutes an "unwarranted intrusion" into the family. It fundamentally alters the nature of the "deep attachments" parents have with their children as sons or daughters. *Rotary Club*, 481 U.S. at 545. It "deprives . . . parents the opportunity to counter influences on" their children they disagree with. *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312 (11th Cir. 1989). It creates "mistrust among the members of [plaintiff's] family" by causing children to view their parents as enemies. *Patel v. Searles*, 305 F.3d 130, 134, 140 (2d Cir. 2002). And it impermissibly "obstructs the parental right to choose the proper method of resolution" of the question of whether the child should undergo a social transition. *Gruenke*, 225 F.3d at 306.

\* \* \*

To be clear, the Does do not assert the District's constitutional obligations are triggered if it has a suspicion—or even direct knowledge—that their children are asserting a transgender identity, or, for that matter, *any* identity or orientation. Rather, the Does assert only that the District may not take *affirmative steps* to socially transition their children by creating an environment where their children are called by a new name and/or pronouns without first obtaining their consent. It is the

creation of this environment by a government actor—and not mere knowledge—that triggers the District's constitutional obligations.

In the alternative, even if the Does do not have the right to *consent* when their children's school socially transitions them (and they do), the Does at least have the right to *notice* of this action. *Hodgson v. Minnesota*, 497 U.S. 417, 483 (1990) (noting the common-law right of parents to be "notified of their children's actions") (Kennedy, J., concurring in part and dissenting in part); *see also Mueller v. Auker*, 576 F.3d 979, 995, 997 (9th Cir. 2009) (holding parental notice is required when government provides healthcare treatment to children). And in the alternative to that, the Does at the very least have the right not to be deceived and lied to by their children's school. *Willey*, 680 F. Supp. 3d at 1277. The Policy fails even these modest commands.

2. <u>The Law and Policy do not satisfy any standard of review.</u>

*a. The Law and Policy fail strict scrutiny*

The parental right is "fundamental." *Troxel*, 530 U.S. at 67 (plurality op.). As such, infringements of it must satisfy strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301–302 (1993); *see also United States v. Bear*, 769 F.3d 1221, 1229 (10th Cir. 2014). To satisfy strict scrutiny, Appellees must show the infringement is "narrowly tailored to serve a compelling government interest." *Reno*, 507 U.S. at 302; *see also*

*Kitchen v. Herbert*, 755 F.3d 1193, 1218 (10th Cir. 2014). Appellees cannot make this showing.

Below, Appellees articulated only one governmental interest—"prohibit[ing] . . . discrimination" against transgender-identifying students. Commissioner Opp'n to Pls.' Mot. for Prelim. Injunc. (ECF 27) at 14. But while this interest may be compelling when the child's parents consent to the child's social transition, it is not compelling in the absence of parental consent. Considering (1) the likely transitory nature of the child's transgender identity, (2) the possibility that social transitioning will cause that identity to persist, and (3) the serious ramifications of persistence on the child's life course, App. 2 at 546, 550–556, 559–60, it is irrational for Defendants to rely solely on minors' self-attestation of their gender identity. Instead, the child's parents must be involved, and if parents say "no," then—absent a finding of parental unfitness—that decision controls, and Defendants lack any anti-discriminatory interest with respect to that child.

Moreover, socially transitioning every child who asks for it without regard to parental consent is not narrowly tailored to prevent discrimination. As noted, most children with a transgender identity will desist, and instead of transitioning, some children simply need counseling to understand the source of their feelings. App. 2 at 546–48. Accordingly, "[s]ocially transitioning every [child] who asks for it is a 'one-size-fits-all' . . . approach that fails to account for the broader and unique issues the

minor may be facing." App. 2 at 556–57. This "one-size-fits-all" approach is the antithesis of narrow tailoring.

Further, socially transitioning children without parental consent violates the constitutionally mandated presumptions of parental fitness and affection. *Parham*, 442 U.S. at 603; *see also Troxel*, 530 U.S. at 65 (plurality op.); *Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (holding unconstitutional statute that presumed unwed fathers were unfit). While the state can overcome these presumptions by making *specific findings* that *specific parents* are unfit or will not act in the best interests of their children, the Law and Policy do not require such a finding before the District socially transitions children. This not only violates the constitution, but it also harms children, which is precisely what these presumptions were designed to guard against.

Alternatively, the Policy's requirements that schools socially transition children without notifying "unsupportive parents" and by deceiving and lying to these parents also fails strict scrutiny. Under the Policy, "unsupportive" parents have no power to halt a social transition their child wants. Accordingly, keeping "unsupportive" parents in the dark does not protect the child from discrimination at school in any way. *See Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1217 (S.D. Cal. 2023) ("The reasons proffered by the defendants [for not notifying parents do not] pass . . . the rational basis test[].");  *Ricard*, 2022 WL 1471372, at *8 n.12 (noting that failure to notify parents is unlikely to "satisfy . . . rational basis"); *see also*

*Willey*, 680 F. Supp. 3d at 1277 (holding that "preclude[ing] . . . school district personnel . . . from answering . . . a parent's or guardian's inquiry as to whether their child is being [socially transitioned] creates a likely constitutional problem").

### b. The Law and Policy fail rational basis review

Even if rational basis review applied (and it does not), the Law and Policy also fail rational basis review. To satisfy rational basis review, laws must "bear a rational relationship to a legitimate government interest." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1182 (10th Cir. 2009). For the same reasons the Law and Policy fail strict scrutiny, they also fail rational basis review.

### 3. The Law and Policy violate the Does' procedural due process rights

When deciding whether to socially transition children at school, District personnel must make the factual determinations that (1) the child's chosen name "reflect[s his or her] gender identity," C.R.S. § 22-1-145(1)(a), and (2) the child's parents are "not supportive" of the transition, App. 3 at 782. Because these determinations involve case-by-case factual determinations implicating parents' substantive rights, the procedural requirements of the Due Process Clause apply. *J.B.*, 127 F.3d at 925 (concluding state action implicating parental right triggers procedural protections); *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997) (same); *see also United States v. Salerno*, 481 U.S. 739, 746 (1987) ("When

government action depriving a person of life, liberty, or property survives substantive . . . scrutiny, it must still be implemented in a fair manner.").

The Law and Policy do not provide parents the most basic requirements of procedural due process—"notice . . . and opportunity [to be heard]"—prior to (or even after) these determinations are made. *Mathews v. Eldridge*, 424 U.S. 319, 338 (1976); *see also Gomes v. Wood*, 451 F.3d 1122, 1128 (10th Cir. 2006) (holding the government must always provide at least post-deprivation hearing for deprivation of parental rights). Accordingly, the Law and Policy violate the Does' procedural due process rights.

## II. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE DOES' HARM WAS NOT IRREPARABLE

The "deprivation of any constitutional right" constitutes irreparable harm sufficient to justify a preliminary injunction. *Free the Nipple*, 916 F.3d at 806. Here, the Does have made a strong showing that they have standing and that the Law and Policy violate their constitutional rights. Moreover, "there is a clear and present need for equitable relief." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (cleaned up). The Does are experiencing both continuing harm and the realistic danger that their daughters will (again) seek to be socially transitioned under the Law and Policy in the relatively near future. The only way to remedy this harm is to enjoin it.

The district court concluded—adopting an argument Appellees did not make—that the Does were not suffering irreparable harm because they delayed in seeking a preliminary injunction. App. 4 at 899. This was legal error.

The movant's delay in seeking preliminary relief can sometimes "cut[] against . . . irreparable injury." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). But "delay is only one factor to be considered among others, and there is no categorical rule that delay bars the issuance of any injunction." *Id.* (citations omitted). Instead, "the question . . . is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,'" and resulted in "prejudice [to] the opposing party." *Id.* Without prejudice to the defendant, delay is categorically insufficient to conclude the plaintiff is not suffering irreparable harm. *Id.* (holding that the "failure [to show prejudice] alone is sufficient . . . to reject" delay argument); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1212 (10th Cir. 2009) (rejecting delay argument where nonmovant did not argue the "delay . . . disadvantaged its interests").

Here, the Does' alleged delay does not defeat their showing of irreparable harm. Most obviously, because Appellees did not make this argument below, they made no showing of prejudice, nor did the district court make any such finding. App. 4 at 899. This Court should reject the district court's conclusion on this ground alone.

Moreover, the Does did not delay in seeking relief. The district court asserted that the Does had delayed for three years, pointing out that a prior version of the

LGBTQ+ Toolkit had been in effect since 2021. *Id.* This was clear error. There is no evidence the Does were aware of the LGBTQ+ Toolkit prior to filing suit. The district court noted that schools are required by statute to provide parents notice of their policies every year, App. 4 at 899 (citing C.R.S. § 22-1-143(3)(c)), but it is doubtful that statute applies to the LGBTQ+ Toolkit. Indeed, the LGBTQ+ Toolkit is not a policy listed on the District's "District Policies" webpage, available online at https://www.sd27j.org/about-us/district-policies (last visited Feb. 4, 2025),[6] and there is no evidence the District provides it to parents.

To be sure, the Does learned the District was socially transitioning A.D. around March 2023, App. 3 at 789, but the delay from March 2023 until August 2024 was neither unreasonable nor a decision by the Does to "sit on their rights." During most of that time, A.D. was still identifying as a boy at school, and the Does were reasonably concerned "that if they strenuously voiced their objection" to her social transition, the District "would contact the Colorado Department of Human Services and arrange for A.D. to be taken from them." *Id.* Suing the District while A.D. was still identifying as a boy could have put the Does' right to retain custody of A.D. at risk, not to mention potentially irreparably damaging their relationship with her. A.D. still went by "Z.D." through the end of the 2023–24 school year, App.

---

[6] The Court should take judicial notice of this website under Federal Rule of Evidence 201. *Richardson*, 565 F.3d at 702 n.22.

3 at 790, and the Does filed suit in August 2024, before the 2024–25 school year began, once A.D. decided to start going by "A.D." again.

On these facts, far from sitting on their rights, the Does acted as soon as they reasonably could without compromising either their right to retain custody of A.D. or their relationship with her. The district court erred in concluding otherwise.

## III. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING THE BALANCE OF HARMS FAVORED APPELLEES

The government "has no interest in keeping an unconstitutional law on the books." *Free the Nipple*, 916 F.3d at 806. Because the Does are likely to succeed on the merits and are suffering irreparable harm, the balance of harms tips in their favor. *Id*.

The district court concluded the balance of harms favors Appellees because the Does faced only "a speculative possibility of future harm." App. 4 at 900. This conclusion, however, flowed from the district court's erroneous conclusion that the Does lacked standing. Because the Does have standing and are likely to succeed on the merits, the district court's conclusion regarding balance of harm was also erroneous.

The district court also concluded the balance of harms favors Appellees because granting the Does preliminary relief "could discourage the District from applying the Law and [Policy] to other students." *Id.* This conclusion was also

erroneous. The Does seek preliminary relief only as to their children. Thus, the District's harm must be evaluated with respect to the Does' children only. In any event, the Does have made a substantial showing that the Law and Policy are unconstitutional. Accordingly, the District has no interest in applying the Law and Policy to any of its students.

## IV. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY CONCLUDING A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST

It is "always in the public interest to prevent the violation of a party's constitutional rights." *Free the Nipple*, 916 F.3d at 807 (cleaned up). Because the Does are likely to succeed on the merits and are suffering irreparable harm, the preliminary injunction is in the public interest.

The district court concluded the preliminary injunction was not in the public interest because the Does did not have standing. App. 4 at 990. But because the Does have standing and are likely to succeed on the merits, the district court's conclusion was erroneous.

## V. THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER BY DENYING THE DOES' MOTION FOR PRELIMINARY INJUNCTION

Because all the preliminary injunction factors favor the Does, the district court erred in denying their motion for preliminary injunction. Moreover, because the record is fully developed, because no party requested a preliminary injunction

hearing, and, as the district court noted, because "there is very little factual dispute," App. 4 at 888, this Court should reverse and remand with instructions for the district court to grant the Does a preliminary injunction without the necessity of a bond. *See Summum v. Pleasant Grove City*, 483 F.3d 1044, 1049 (10th Cir. 2007) ("[R]ather than remanding to the District Court for the appropriate analysis, we find the record sufficiently developed to allow us to determine whether Summum has met its burden under the four factors necessary to prevail on its motion."), *rev'd on other grounds sub nom. Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1075–76 (10th Cir. 2001) (reversing district court's denial of preliminary injunction and remanding with instructions to enter injunction); *see also Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 3d 1033, 1061 (D. Colo. 2023) (holding no bond required for preliminary injunction enforcing constitutional rights against the government where the government will not incur any costs).

## VI.   THE DISTRICT COURT COMMITTED LEGAL ERROR IN THE PI ORDER AND AG DISMISSAL ORDER BY CONCLUDING THE ATTORNEY GENERAL WAS ENTITLED TO SOVEREIGN IMMUNITY

In resolving a Rule 12(b)(1) motion based on the sufficiency of the complaint, the district court applies the same legal standard applicable to a Rule 12(b)(6) motion. *See Garling v. EPA*, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017); *Schmitz v. Colo. State Patrol*, 841 F. App'x 45, 54 (10th Cir. 2020). Under Rule 12(b)(6), the

complaint must only allege "sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

In the AG Dismissal Order, the district court concluded the Attorney General was entitled to sovereign immunity because the FAC did not allege he had sufficient enforcement obligations under the Name Change Law to bring him within *Ex Parte Young*. App. 4 at 904–06. The Does do not seek review of that conclusion.

The district court, however, also rejected the Does' request that the court construe the FAC to assert a request for prospective relief against the Attorney General in connection with the public accommodation provisions of CADA, C.R.S. § 24-34-601, *et seq.* App. 4 at 905 n.4. Because the district court refused the Does' request, the court concluded, in the PI Order, that the Does were not substantially likely to succeed on their claims against the Attorney General and, in the AG Dismissal Order, that he should be dismissed from this case. App. 4 at 888-891, 906. The district court erred in denying the Does' request.

To understand why, some background is in order. The FAC does not specifically seek prospective relief pertaining to CADA. CADA applies to public schools, but the Does did not originally interpret CADA to require schools to socially transition students without parental consent. Indeed, if CADA already imposed such a requirement, it raises the question of why the Name Change Law was enacted. *See Lockhart v. United States*, 577 U.S. 347, 356 (2016) (discussing rule against

superfluity); *see also United States v. Wesley*, 60 F.4th 1277, 1284 (10th Cir. 2023) (noting that the "specific controls . . . [the] general"). Moreover, interpreting CADA's ambiguous prohibitions, *see* C.R.S. § 24-34-601(2)(a), to require schools to socially transition students without parental consent would raise serious constitutional questions for the reasons discussed in Section I.B above. *See Gonzales v. Carhart*, 550 U.S. 124, 154 (2007) (discussing canon of avoidance).

In Commissioner Córdova's Rule 12 motion to dismiss, however, she took the position that CADA required schools to socially transition students without parental consent. Commissioner Mot. to Dismiss (ECF 62) at 6 (citing 3 Code Colo. Regs. 708-1, Rule 81.6(A)(4) (prohibiting "[d]eliberately misusing an individual's preferred name, form of address, or gender-related pronoun")). The Commissioner further argued the Does' injury was not redressable because the FAC challenged only the Law and Policy, and not CADA. *Id.*

Even assuming CADA requires schools to socially transition students without parental consent, the Commissioner's redressability argument fails on its own terms. *See Larson v. Valente*, 456 U.S. 228, 242 n.15 (1982) (rejecting argument that to establish standing the plaintiff must demonstrate "there is no other means by which the State can" bring about the same injury); *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 757–58 (10th Cir. 2010) (holding redressability exists where injunction would preclude one of several enforcement mechanisms). Out of an

abundance of caution, however, in their consolidated opposition to Appellees'
motions to dismiss, the Does asked the district court to construe the FAC to seek
prospective relief against CADA's enforcement. Pls.' Consolidated Opp'n to Defs.'
Mots. to Dismiss (ECF 70) at 18. Importantly, the Does did not ask the district court
to construe the FAC to allege any new *facts*. Rather, they asked the district court
only to interpret the FAC to request a *remedy* against the Attorney General's
prospective enforcement of CADA based on the facts already alleged. *Id.*

The district court erroneously rejected the request. Under Rule 54(c), a court
"should not dismiss a meritorious constitutional claim because the complaint seeks
one remedy rather than an another plainly appropriate one." *EEOC v.
CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1175 (10th Cir. 2017) (quoting *Holt
Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65–66 (1978)). Here, the FAC seeks
prospective relief against the Law and Policy and asks for all "further relief that the
Court deems just and proper." App. 3 at 805. To the extent CADA authorizes schools
to socially transition children without parental consent, as the Commissioner claims,
CADA violates the Does' parental rights for the exact same reasons the Law and
Policy do. Accordingly, prospective relief against CADA is "just and proper," and
the district court erred by failing to construe the FAC to seek that relief. *Travis v.
Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 112 (7th Cir. 1990) ("Fed. R.

Civ. P. 54(c) requires courts to award the relief to which the prevailing party is entitled, even if that party did not request the relief or relied on the wrong statute.").

As the FAC makes clear, *any* state law authorizing children to decide whether to undergo a social transition without parental consent is invalid. Because the Commissioner has taken the position that CADA authorizes children to decide whether to undergo a social transition without parental consent, the district court erred in failing to construe the FAC to seek prospective relief against CADA. *See People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 997 (10th Cir. 2017) (construing complaint that was limited to one regulation to nevertheless "attack[] . . . Congress's ability to authorize *any* regulation" (emphasis in original)).

Moreover, the FAC plausibly alleges the Attorney General is a proper party to enforce CADA. Under CADA, the Attorney General has both (1) the power to file administrative charges of discrimination on behalf of aggrieved students with the Colorado Civil Rights Division and (2) the obligation to prosecute student charges that go to a formal hearing. C.R.S. § 24-34-306(1)(b) (providing Attorney General may file administrative charges); 3 Code Colo. Regs. 708-1, Rule 10.8(A)(3) ("The case in support of the complaint *shall* be presented at the hearing by the attorney general's office . . . ." (emphasis added)). Accordingly, as this Court has previously concluded, the Attorney General has a particular duty to enforce CADA. *See 303*

*Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021) (holding Attorney General was proper defendant to challenge to CADA because he has "authority to enforce CADA"), *rev'd on other grounds*, 600 U.S. 570 (2023); *see also Peterson v. Martinez*, 707 F.3d 1197, 1207 (10th Cir. 2013) (noting that a party has a "particular duty" to enforce a law when set forth in "an administrative delegation").

The FAC also plausibly alleges the Attorney General is willing to exercise these rights and obligations. The Attorney General has joined amicus briefs around the country touting the purported importance of allowing schools to socially transition children upon their request. *See, e.g.*, App. 3 at 732 (noting the "compelling interest in providing public schools where [transgender-identifying] students . . . can thrive"); *see also* App. 3 at 809–839 (similar). And in this very litigation, the Attorney General has vigorously defended the state's ability to empower children to decide for themselves whether to undergo a social transition at school without parental consent. Commissioner's Mot. to Dismiss (ECF 27) at 21–22 (arguing "the purpose of assigning control over the question to the student is to allow the school building to be an inclusive, welcoming space where the student can learn—even . . . when the parents disagree about what it means to create an inclusive, welcoming space"); Attorney General's Mot. to Dismiss (ECF 29) at 10 (incorporating this argument).

On these facts, the Attorney General's "strenuous assertion" that school-based social transitions without parental consent are appropriate, "indicates that [his] enforcement [of CADA] is anything but speculative," particularly considering he has not "disavowed" his duty to enforce CADA. *303 Creative*, 6 F.4th at 1174; *see also Bella Health & Wellness v. Weiser*, 699 F. Supp. 3d 1189, 1211 (D. Colo. 2023) (holding Attorney General was proper defendant where he was required by law "to bring charges referred to him" and he did not "disavow" enforcement). Because the Attorney General has a particular duty and demonstrated willingness to enforce CADA, the district court erred by concluding the Does were not substantially like to prevail against him and by dismissing him from this case.

## CONCLUSION

This Court should REVERSE and REMAND the district court's denial of the Does' motion for preliminary injunction with instructions for the district court to enjoin Appellees from enforcing against the Does' children the Name Change Law, the Parental Exclusion Policy, and any other provision of law—including but not limited to CADA—Appellees contend requires the social transition of children without parental consent—or, in the alternative, without parental notice—during the pendency of this litigation.

In addition, this Court should REVERSE the district court's grant of the Attorney General's motion to dismiss and REMAND for further proceedings.

February 4, 2025

Respectfully submitted,

By: */s/Joshua W. Dixon*

Joshua W. Dixon
Eric A. Sell
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, Md 21771
jdixon@libertycenter.org
esell@libertycenter.org

*Attorneys for Appellants*
JOHN AND JANE DOE

## WORD COUNT CERTIFICATE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this brief contains 12,955 words/uses a monospaced typeface and contains 1,123 lines of text.

February 4, 2025

Respectfully submitted,

By: */s/Joshua W. Dixon*

Joshua W. Dixon
Eric A. Sell
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, Md 21771
jdixon@libertycenter.org
esell@libertycenter.org

*Attorneys for Appellants*
JOHN AND JANE DOE

## 10th Cir. R. 28.2(C)(2) STATEMENT

Oral argument is requested because the matters at issue are of grave importance in the lives of children in Colorado. In addition, the legal issues involve serious questions of Article III jurisprudence and constitutional law that have divided district courts around the country. Oral argument will allow the Court to conduct a more thorough evaluation of these pressing questions.

## 10th Cir. R. 28.2(A)(1) COPIES OF OPINIONS AND ORDERS

See below

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:24-cv-2185-CNS-SBP

JOHN AND JANE DOE,

     Plaintiffs,

v.

PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado;
SUSANA CÓRDOVA, in her official capacity as Commissioner of the Colorado
Department of Education; and
SCHOOL DISTRICT 27J a/k/a 27J SCHOOLS, in its official and personal capacities,

     Defendants.

---

## ORDER

---

Before the Court is Plaintiffs' motion for a preliminary injunction. ECF No. 2. Defendants School District 27J (the District), Susana Córdova (the Commissioner), and Philip Weiser (the Attorney General) all oppose Plaintiffs' request for a preliminary injunction. ECF Nos. 25, 27, 29.[1] Plaintiffs and Defendants Córdova and Weiser also requested that the Court rule on the motion for preliminary injunction without a hearing. For the reasons below, the Court DENIES the motion for preliminary injunction.[2]

---

[1] Plaintiffs recently filed a notice of supplemental authority, ECF No. 78, but the Court has determined that such authority is relevant to the merits of the case rather than the preliminary injunction. The Court will address it in its forthcoming order on the motions to dismiss.
[2] This Order renders Defendant Córdova's motion for discovery, ECF No. 37, moot.

1

                                          A_000880

## I.  BACKGROUND

In this lawsuit, Plaintiffs request a declaration that House Bill 24-1039, codified at Colo. Rev. Stat. §§ 22-1-145, *et seq.* (the Law), and the District's related policies,[3] are both facially invalid and invalid as applied to Plaintiffs. ECF No. 52 at 38 (First Amended Complaint). They also seek a permanent injunction preventing Defendants from implementing or enforcing the Law and Policies. *Id.* In the present motion, Plaintiffs seek to preliminarily enjoin Defendants from enforcing the Law and Policies as applied to their two children, A.D. and B.D., and from "socially transitioning" A.D. and B.D. without Plaintiffs' written consent. ECF No. 2 at 1–2.

### A.  HB24-1039 and the District's Antidiscrimination Policies

Colorado statutes impose nondiscrimination duties on school districts. *See* Colo. Rev. Stat. § 22-32-109(1)(ll)(I)(A). Since 2008, Colorado's nondiscrimination laws have included sexual orientation, which was defined to include transgender status. 2008 Colo. Sess. Laws, ch. 341. In 2021, the legislature updated the legal framework to distinguish sexual orientation from gender identity and gender expression. Colo. Rev. Stat. §§ 24-34-301(9), (10), (24). Colorado requires school districts to adopt policies to address discrimination and harassment, which must include procedures for accepting complaints, investigating complaints, and providing support. Colo. Rev. Stat. §§ 22-1-143(1)–(2). The policies must be public, clear, and communicated frequently to parents and students.

---

[3] Plaintiffs refer to the District policies collectively as the "Parental Exclusion Policy" or the Policy, and state that it includes the LGBTQ+ Toolkit, the Bullying Prevention and Education Policy: JICDE (forbidding "[g]ender identity harassment"), and Policy ACA. ECF No. 52, ¶ 73. Calling the District's antidiscrimination policies the "Parental Exclusion Policy" is inherently misleading and presupposes that the policies exclude parental involvement. As will be discussed in depth below, the policies actually *encourage* parental involvement. Thus, the Court will refer to the policies, when referring to them collectively, as the Policies.

Colo. Rev. Stat. § 22-1-143(3). Related investigations must be confidential. C.R.S. §§ 22-1-143(2a), (7).

House Bill 24-1039, effective April 2024, requires public school employees to address students by their chosen name reflecting that student's gender identity, and provides that knowingly failing to do so is discriminatory.[4] C.R.S. § 22-1-145 *et seq.* The student's wishes, therefore, control. *Id.* For many school districts, this change merely codified their existing antidiscrimination policies and practices. *See* ECF No. 27 at 5. HB 24-1039 does not mention parental consent or exclusion and gives districts substantial discretion over implementation. *Id.*; C.R.S. § 22-1-145(5).

The rights of parents are codified in other statutes. Relevant here, parents receive notice of a district's policies every year, C.R.S. § 22-1-143(3)(c); they have a right to access student records upon request, C.R.S. § 22-1-145(5); and they have a right to request medical accommodations, C.R.S. § 22-1-143(6)(a).

The District has policies that govern the process for supporting transgender, non-binary, and gender non-conforming students. ECF No. 52, ¶¶ 71–83. Generally, the policies prohibit discrimination and bullying on the basis of sex, sexual orientation, gender identity, gender expression, and other categories. *See* Policy AC, ECF No. 25-1; Policy JICDE, ECF No. 25-2. The LGBTQ+ Toolkit (the Toolkit) contains the District's policies, procedures, and resources for supporting LGBTQ+ students. ECF No. 52, ¶¶ 71–72; ECF

---

[4] C.R.S. § 22-1-145(1)(a) states:
> (2) A public school employee, educator, and contractor . . . shall address a student by the student's chosen name and use the student's chosen name in school and during extracurricular activities.
> (3) Unless done at a student's request, knowingly or intentionally using a name other than the student's chosen name or the knowing or intentional avoidance or refusal to use a student's chosen name is discriminatory.

No. 52-J (the Toolkit). It has been in place since February 2021, undergoing minor revisions after the passage of HB24-1039 in April 2024. *Id.*

The Toolkit directs staff to affirm a student's choice if they initiate a discussion about changing their name or pronouns and discuss how best to support that choice. ECF No. 52-J at 4–5. Students can change their name, pronouns, and gender in their school records, which, students are advised, are visible to anyone with access to the records, including parents, guardians, and staff. *Id.* at 6–7, 8. Alternatively, students can note their preferred name or pronouns in a "flag" in their online file that only District staff can view. *Id.* at 7–8. The Toolkit notes that, because the pronoun flag is not visible to parents, it may be used by students who "are not 'out' to their parents/guardians." ECF No. 52-J at 8.

The Toolkit directs counselors to work with the student to decide whether, and to what extent, the parents or guardians will be involved, and counselors "must consider the health, well-being and safety of the student in transition." *Id.* at 6. Where possible, the Toolkit encourages parental involvement: "the goal should be to support the student's family in accepting their child's gender identity and seek opportunities to foster a better relationship between the student and their family." *Id.* at 12–13. Counselors are also advised to "ask whether the student's family is accepting in order to avoid inadvertently putting the student at risk of greater harm by discussing [the issue] with the student's family." *Id.* at 12. The Toolkit also states that "school staff shall not disclose any information that may reveal a student's transgender status to others, including parents or guardians and other school staff, unless legally required to do so or unless the student has authorized such disclosure," which includes using "the student's legal name and the

pronoun corresponding to the student's gender assigned at birth unless the student, parent, or guardian has specified otherwise." *Id.* at 14. The Toolkit further emphasizes the importance of transgender students feeling "safe enough to be themselves" and having "a safe place to learn." *Id.* at 12.

### B. The Does' Children: A.D. and B.D.

A.D. and B.D. attend school in School District 27J in Brighton, Colorado. ECF No. 52, ¶¶ 84, 157.[5] A.D. is currently a junior in high school, and B.D. is in middle school. *Id.,* ¶¶ 138, 157. A.D. currently uses her birth name and "she/her" pronouns.[6]

In eighth grade, A.D. told her counselor that she was questioning her gender identity as female, that she preferred "they/them/their" pronouns, and that her parents did not support her questioning of her gender identity. ECF No. 25-E (Decl. Middle School Counselor), ¶ 3. The counselor, with AD's permission, put a "flag" in her online file noting that A.D. preferred "they/them/their" pronouns, which was only visible to District staff. *Id.,* ¶ 4. The counselor told A.D.'s teachers about the preferred pronouns. *Id.,* ¶ 5. The counselor did not coach A.D. or encourage questioning of her gender identity or use of "they/them/their" pronouns. *Id.,* ¶ 6. The counselor did not tell A.D.'s parents about the flag because A.D. had told the counselor that her parents did not support her questioning her gender identity. *Id.,* ¶ 7–8. Importantly, Plaintiffs never asked the counselor about this. *Id*. A.D. never told the counselor that she identified as a transgender male or that she wanted to be referred to by another name than A.D. *Id.,* ¶ 10.

---

[5] The facts in this section are taken from the amended complaint, ECF No. 52, and from declarations attached to the District's response to the preliminary injunction request, ECF No. 25.

[6] In the briefing, Plaintiffs refer to A.D. with she/her pronouns and indicate that she currently uses these pronouns. The Court will therefore refer to A.D. using she/her pronouns.

After beginning high school in August 2022, A.D. met with her assigned school counselor. The counselor greeted A.D. using her birth name, but A.D. responded, "My name is Z.D." ECF No. 25-F (Decl. High School Counselor 1), ¶ 3. The counselor noticed the pronoun flag and concluded that A.D. was questioning or transitioning her gender identity. *Id.*, ¶ 3. The counselor and A.D. did not discuss her potential transgender status at the meeting, nor did the counselor coach or encourage A.D. to question or transition her gender identity. *Id.* In a later meeting, A.D. told the counselor that she was struggling with mental health, in part because her parents did not support her being transgender. *Id.*, ¶ 5. The counselor referred A.D. to IMatter, a state-funded program that provides up to six free, virtual, and confidential therapy sessions to Colorado youth. *Id.*

In March 2023, A.D. told the counselor that her mom had emailed her expressing anger with A.D. for being transgender, using a different name at school, and accessing therapy through IMatter. *Id.*, ¶ 9. A.D. told the counselor that she was afraid to go home and that her parents "don't understand me; they want me to be a girl, but I don't feel like a girl. In my head and in my body, I feel like a boy." *Id.*, ¶ 9.

The counselor, with A.D.'s permission, called A.D.'s mom to talk about the issue. *Id.*, ¶ 9. In the conversation, the counselor told Ms. Doe that A.D. was extremely upset over the email and was afraid to go home. *Id.*, ¶ 10. Ms. Doe responded, "I would never harm my child; I'm just worried about her." *Id.* The counselor told Ms. Doe that A.D. was very stressed that her parents did not accept her being transgender; Ms. Doe responded, "I'm a feminist, and [A.D.] is not honoring her femininity." *Id.* The counselor concluded that, while A.D.'s parents did not support her being transgender, A.D. did not appear to

be in danger of abuse or neglect. *Id.* A.D. confirmed the next day that she was physically safe, but that her parents "just don't understand who I am." *Id.*, ¶ 11.

In May 2023, A.D. and the counselor created a gender support plan so that when A.D. had a new counselor her sophomore year, the new counselor would know A.D.'s chosen name and pronouns. ECF No. 25-F, ¶ 12; ECF No. 25-G (GSP). The gender support plan stated that A.D.'s parents were aware that she was transgender but were not supportive and that staff should refer to A.D. using her birth name and she/her pronouns when speaking with her parents. ECF No. 25-G at 2. A.D. never authorized the counselor to share the plan, and thus, the counselor did not share it with anyone. ECF No. 25-F, ¶ 12.

In March 2024, the spring of A.D.'s sophomore year, A.D. told her parents that she "no longer identified as a boy and wished to return to living life as a girl." ECF No. 52, ¶ 135. In May 2024, she asked another school counselor to remove the pronoun flag from her online file. *Id.*, ¶ 136. A.D. did not ask her teachers to stop calling her Z.D. or using "they/them/their" pronouns, and her teachers continued to refer to her that way. *Id.*, ¶¶ 136–37.

C.R.S. § 22-1-145 went into effect on April 29, 2024. In July 2024, consistent with C.R.S. § 22-1-145, the District adopted Policy ACA, which "outlines the process by which students may change the name they are referred to at school to align with their gender identity." ECF No. 25-J (Policy ACA). The policy states that students may choose to be identified in school by the first name that they have designated and may request a change to their name or gender on their official student record. *Id.* Students do not need parental approval to use a chosen name, but parents "may be notified of their student's name

change if appropriate." *Id.* The Toolkit was then updated to reflect Policy ACA. ECF No. 25-C at 6–7.

Now in A.D.'s junior year, which started in August 2024, her new teachers call her A.D. and use "she/her" pronouns. *Id.*, ¶¶ 138–39. A.D. has informed some of her former teachers that she goes by A.D., including the art teacher. *Id.*; ECF No. 25-L (Art Teacher Decl.), ¶ 4. She also told the art teacher, "Nothing to worry about, that's just my choice." *Id.* A.D. also corrected the art teacher after the teacher used "they/them/their" pronouns, noting that she preferred "she/her" pronouns. *Id.*, ¶ 5. A.D. intends to tell more of her prior teachers and advisers when she feels the time is right. ECF No. 52, ¶ 141.

A.D.'s sibling, B.D., has not indicated any desire to use pronouns other than "she/her" or to use a name other than B.D. Plaintiffs allege that the District is introducing her to the concept of transgender identities and that there are pressures for her to "socially transition," which "makes it likely" that she will seek to use different pronouns at school. ECF No. 2 at 25.

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). To prevail on a preliminary injunction motion, movants bear the burden of showing that: (1) they are likely to succeed on the merits; (2) they will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs the injury the injunction would cause the opposing party; and (4) the injunction would not adversely affect the public interest. *See Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (citation omitted). "An injunction can issue only if

each factor is established." *Denver Homeless Out Loud v. Denver, Colorado*, 32 F.4th 1259, 1277 (10th Cir. 2022) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual, and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003). Irreparable harm is more than merely serious or substantial harm. *Id.* "[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.*

The purpose of injunctive relief is to prevent future violations of the law, and thus a plaintiff must demonstrate "a good chance of being likewise injured in the future." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *Facio v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991). An evidentiary hearing in response to a motion for preliminary injunction is not required, and courts have discretion to determine whether to hold such a hearing. *See Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014).

### III. ANALYSIS

No party requested a preliminary injunction hearing. Because there is very little factual dispute, the Court finds that a hearing would not assist in the resolution of the motion. The Court further finds that Plaintiffs cannot establish all four factors necessary for a preliminary injunction, particularly likelihood of success on the merits, and thus declines to issue a preliminary injunction.

#### A. Likelihood of Success on the Merits

To warrant a preliminary injunction, Plaintiffs must first show that they are likely to succeed on the merits. Plaintiffs assert that the Law and Policies violate their substantive due process rights, procedural due process rights, and First Amendment rights. Plaintiffs

9

A_000888

argue that the Law and Policies are unlikely to survive constitutional scrutiny, so it is likely that they will win a merits trial. Defendant Weiser argues that Plaintiffs are unlikely to succeed on the merits because he is entitled to sovereign immunity, and the remaining Defendants argue that Plaintiffs are unlikely to succeed on the merits because they lack standing and the request suffers from other deficiencies. The Court addresses these arguments in turn, ultimately agreeing with Defendants on both points.

### 1.  Attorney General Immunity

Defendant Weiser, Colorado's Attorney General, argues that Eleventh Amendment sovereign immunity shields him from suit. The Court agrees.

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)). The bar extends to suits against officials in their official capacities. *Hendrickson v. AFSCME Council 18,* 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

An exception to the bar exists for suits against state officials "seeking to enjoin alleged ongoing violations of federal law," but the official "must have some connection with the enforcement of the act." *Peterson*, 707 F.3d at 1206 (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011)); *Ex parte Young*, 209 U.S. 123, (1908). For the exception to apply, the state official must have "a particular duty to enforce" the statute and "a demonstrated willingness to exercise that duty." *Peterson*, 707 F.3d at 1205. Such a duty cannot just be a "mere general duty to enforce the law"; it must arise from the challenged law, another law, an administrative delegation, or a

                                    A_000889

demonstrated practice of enforcing a provision. *Hendrickson*, 992 F.3d at 965; *Peterson*, 707 F.3d at 1207.

The Attorney General argues that HB24-1039 does not impose any enforcement duty on him. Instead, the Law delegates enforcement to the public schools: it allows students to file a report or complaint with their public school or local education provider that governs their public school. C.R.S. § 22-1-145(4). Absent a particular duty to enforce in the statute, the exception does not apply.

Plaintiffs disagree, arguing that the Attorney General has the general enforcement power to enforce Colorado's laws and that this duty is sufficient to avoid Eleventh Amendment immunity. Plaintiffs cite to Colo. Rev. Stat. § 24-31-113, which grants the Attorney General the authority to bring an enforcement action against "any governmental authority" for violating state law. However, this is just a general duty to enforce laws, which is not enough to avoid Eleventh Amendment immunity. An official's "general enforcement power . . . does not suffice for *Ex parte Young*." *Hendrickson*, 992 F.3d at 967. Thus, the Attorney General does not have a particular duty to enforce HB24-1039.

Nor does the complaint establish that the Attorney General has demonstrated a willingness to exercise an enforcement duty in this arena. There are no allegations that the Attorney General has taken action to enforce HB24-1039 against the District, or any other school district. Plaintiffs instead refer to an amicus brief that the Attorney General filed in the Ninth Circuit in support of a similar law in California. ECF No. 34-6 at 1. The brief referenced Colorado's "compelling interest in providing public schools where all students are included and can thrive." *Id.* Based on this asserted interest, Plaintiffs argue, the Attorney General is likely to bring an enforcement action against a school district that

violated HB24-1039. *Id.* However, this statement only demonstrates the Attorney General's stated commitment to antidiscrimination; that alone is insufficient to demonstrate a willingness to enforce the law.[7]

Because Plaintiffs have not established that the Attorney General has a particular duty to enforce HB24-1039, or that he has demonstrated a willingness to exercise that duty, he appears to be entitled to Eleventh Amendment sovereign immunity. Plaintiffs are thus unlikely to succeed on the merits against the Attorney General.

       2.  *Standing*

The other Defendants argue that Plaintiffs lack standing and so cannot succeed on the merits. At the preliminary injunction stage, "a plaintiff must make a 'clear showing' that they have standing and are 'entitled to such relief.'" *Nat'l. Ass'n for Gun Rights v. Polis*, No. 24-cv-00001-GPG-STV, 2024 WL 3085865 at *5 (D. Colo. May 2, 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) ("At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [they] [are] 'likely' to establish each element of standing."). The Court agrees that Plaintiffs have failed to make a clear showing that they suffered an injury-in-fact sufficient to establish standing at the preliminary injunction stage, and so they are unlikely to succeed on the merits.

To establish Article III standing, plaintiffs must first have suffered an "injury in fact" to a legally protected interest. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Second, plaintiffs must establish that the injury is fairly traceable to the challenged action.

---

[7] *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1223–24 (S.D. Cal. 2023), in contrast, held that the California Attorney General was a proper party because the Attorney General had previously taken enforcement action against two school districts.

*Id.* Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotations and citations omitted). Here, the issue is whether Plaintiffs have established an injury-in-fact.

### a. Injury-In-Fact

To constitute an injury in fact, a plaintiff must show that they have suffered or likely will suffer an "invasion of a legally protected interest" that is both (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Rocky Mountain Gun Owners*, 121 F.4th at 109 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "concrete," it "must be 'de facto,' it must 'exist,' and it must be 'real' rather than 'abstract.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). It need not be tangible. *Id.* To be "particularized," the injury must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

An injury-in-fact may be "imminent," meaning that a plaintiff "need not wait for the harm to occur" or expose themselves "to actual arrest or prosecution to be entitled to challenge a statute" that they claim "deters the exercise" of their constitutional rights. *Rocky Mountain Gun Owners*, 121 F.4th at 109; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10, 414 n.5 (2013). However, "'allegations of *possible* future injury' are not sufficient." *Clapper*, 569 U.S. at 409 (quoting *Whitmore*, 495 U.S. at 158). The threatened injury "must be certainly impending and not merely speculative." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (internal quotations omitted).

Pre-enforcement challenges to laws that have yet to be applied to the plaintiff typically occur as challenges to: (1) an existing law under which the plaintiff has previously been prosecuted; (2) an existing law where the plaintiff has yet to be prosecuted; or (3) an enacted law before it takes effect. *Rocky Mountain Gun Owners*, 121 F.4th at 110. To bring a pre-enforcement challenge, the plaintiff must show: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the challenged statute; and (2) that "there exists a credible threat of prosecution thereunder." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). The first requirement involves presenting "concrete plans to engage in the conduct" that would potentially violate the challenged statute once it goes into effect. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 551 (10th Cir. 2016). "Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient." *Rocky Mountain Gun Owners*, 121 F.4th at 110 (quoting *Lujan*, 504 U.S. at 564). Plaintiffs must show "a credible and imminent threat of enforcement." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 873 (10th Cir. 2020).

For the most part, Plaintiffs are bringing a pre-enforcement challenge. A.D. stopped using "they/them" pronouns and the name Z.D. in March 2024, and the Law went into effect afterwards, on April 29, 2024, meaning that Plaintiffs are challenging a law that has not yet been applied to their children. As to the Policies, the only policy that was in place and applied to A.D. was the Toolkit; the other policies were not in place until after she returned to using "she/her" pronouns and the name A.D. A preliminary injunction is only appropriate to prevent future harm, so any prior application of the Toolkit cannot be

addressed by a preliminary injunction.[8] The focus is on any ongoing injury and risk of future harm caused by the Law and Policies.

Plaintiffs argue that, even though the Law has not yet been applied to them, they have suffered both actual injury in the form of ongoing harm and imminent injury due to a risk of future harm.

<center>

*i.    Actual Injury: Ongoing Harm*

</center>

Defendants argue that Plaintiffs are not suffering an actual injury because the Law and Policies are not being applied to their children. Plaintiffs argue that they are suffering three ongoing injuries, even if their children never seek to change their name at school: Plaintiffs' inability to obtain accurate information about whether their children are "social transitioning"; the creation of a decisional framework that authorizes children to make decisions without their parents; and the fact that Plaintiffs have changed their behavior in response to the Law and Policies. ECF No. 34 at 9.

The Court is not convinced that Plaintiffs have made a clear showing of ongoing harm. While Plaintiffs point to a case concluding that a parent who requests information about what name and pronouns their child uses at school, and is denied or lied to, may have suffered an injury-in-fact, no such thing occurred here. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees,* 680 F. Supp. 3d 1250, 1277 (D. Wyo. 2023)*.* Moreover, absent such a denial happening, the possibility of that denial does not constitute ongoing harm. *See Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 657 F. Supp 3d 1161, 1170–71 (W.D. Wis. 2023), *aff'd*, 95 F.4th 501 (7th Cir. 2024), *cert. denied*, 2024 WL 5036271 (Dec. 9, 2024) (finding that plaintiffs did not have

---

[8] Moreover, the lack of irreparable harm, as discussed below, also weighs against a preliminary injunction with respect to the Toolkit.

<center>15</center>

standing partly because "plaintiff does not allege . . . that any parent or guardian [in the plaintiff organization] has been denied information related to their child's identity").[9]

The second and third theories of ongoing harm are similarly unlikely to succeed. Plaintiffs argue that they have a fundamental right to be involved in their children's decision-making process; however, they have not met their burden of showing that the Law or Policies infringe on this right. Despite the claim that "the District is socially transitioning their children," the District is not the decision maker at issue: the student is. The Law and Policies only require the District to follow the student's chosen name and pronouns and to provide support. There is no indication that the Law or Policies provide the District with any decision-making power, and there is no indication that it shifts decision-making power from parents. The power to make decisions regarding a student's preferred name and pronouns has always resided with the student.

Plaintiffs' third theory of ongoing harm is that they are injured by having to change their behavior because of the Law and Policies by requiring them to speak to their children about gender-related issues, self-censor their speech with B.D. to avoid implying that they would not approve of a social transition, and monitor their children's activities at school more closely. ECF No. 34 at 18. The Court is not convinced that Plaintiffs are "required to engage in these behavioral modifications" to counter the impacts on their relationships with their children, or that such modifications constitute harm. The only caselaw Plaintiffs cite to support this theory is a dissent and a case in which the Supreme Court found that it was reasonable to expect that illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway. *Friends of the Earth,*

---

[9] Because this case appeared to be directly on point, the Court delayed issuing this Order pending a decision on the petition for certiorari.

*Inc. v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 184 (2000). In contrast, here, there is no reasonable causal connection between these alleged behavioral shifts and the Law and Policies. It is also unclear how the alleged behavioral shifts are harmful, whereas losing recreational access to a waterway clearly is.

These theories of ongoing harm essentially boil down to fears that the Law and Policies might be applied in the future, which is not enough to confer standing. *See Parents Protecting Our Children, UA*, 657 F. Supp 3d. at 1170–71 ("Although plaintiff argues that defendants' Guidance denies its members the information they need to exercise their constitutional decision-making authority regarding their children, the actual application of the Guidance to *their* children remains fatally speculative."). These allegations do not support an inference that any actual harm is presently occurring.

### ii.   Imminent Injury: Future Harm

Plaintiffs also argue that they face a "realistic danger" of future harm: that A.D. will seek to re-transition, or that B.D. will seek to transition, in the relatively near future and that the Law and Policies will be enforced to allow them to use different names and pronouns at school without Plaintiffs' consent or knowledge. *Id.* at 9–10. Plaintiffs argue that there is "a realistic danger that [A.D.] will come to identify as a boy again and seek to be socially transitioned," and that the same is true of B.D. because "the District is introducing the concept of transgender identities to her at too young of an age to comprehend, there are peer and other outside pressures at the District to socially transition, and the environment to which B.D. is exposed at her middle school makes it likely that she will come to have a transgender identity and seek to be socially transitioned at school." ECF No. 2 at 24.

A_000896

The Court agrees with Defendants that Plaintiffs have only established a speculative possibility of injury. It is possible that A.D. will change her mind and again choose to use "they/them/their" pronouns and the name Z.D., but this is merely speculation that does not rise to "certainly impending." Plaintiffs do not currently have "concrete plans" or "an intention to engage in a course of conduct" that the Law or Policies would proscribe, because A.D. does not currently have the intention of using non-female pronouns or the name Z.D. again.

As Defendants point out, Plaintiffs allege that A.D. currently identifies as a girl, "regrets wanting to transition and now believes that her underlying mental health struggles prompted her to adopt a transgender identity," and "is thankful that her parents did not allow her to undergo irreversible medical procedures." ECF No. 52, ¶¶ 142–43. Defendants argue that these allegations, particularly that she regrets wanting to transition, indicate that it is improbable that A.D. chooses to use "they/them/their" pronouns or the name Z.D. again. The possibility that A.D. might (1) identify as non-female in the future, (2) ask the District to use a different chosen name or pronouns, and (3) ask the District to not include her parents in the process, is too attenuated and speculative to show a credible and imminent threat of enforcement. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) ("[W]e have repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient.").

Plaintiffs also argue that A.D. faces social pressure against de-transitioning, which makes it more likely that she will choose to identify as a boy. Again, the possibility that A.D. may change her mind due to alleged pressures is not sufficient to classify A.D.'s

potential future choice to use "they/their/them" pronouns or another name at school as "certainly impending." And, as the District points out, the law only applies to students choosing to use a different name to reflect their gender identity; it would not apply to a student choosing to use a different name to conform to peer pressure. ECF No. 27 at 10.

The Court is also not convinced that Plaintiffs have established injury through the possibility that B.D. might choose to socially transition at school. There is no indication that B.D. has ever expressed any transgender or gender nonconforming identification. Alleged but unidentified social and environmental pressures to transition are not sufficient to make B.D.'s potential future transition into anything other than speculation.

In sum, the possibility of Plaintiffs' future injury is too attenuated and too speculative. Other federal courts have held the same regarding similar policies. *Parents Protecting Our Children*, 657 F. Supp. 3d at 1161; *Parents Defending Education v. Linn-Mar Cmty. Sch. Dist.*, 629 F. Supp. 3d 891 (N.D. Iowa 2022) (vacated as moot following legislation passage) (finding no standing because the "theory that (1) their child will express a desire for or indicate by mistake a desire for a plan, (2) the child will be given a plan, (3) without parental consent or knowledge, (4) and the information will be hidden or denied when parents ask requires too many speculative assumptions without sufficient factual allegations to support a finding of injury"). As in *Clapper*, the chain of causation is also weakened by its reliance on third parties' discretionary acts: the student's choice to express a desire for new pronouns and name without their parents' involvement.

Because Plaintiffs have not made a clear showing that they have standing at this stage, they are unlikely to succeed on the merits. The first preliminary injunction factor

weighs in favor of Defendants, which could end the analysis. However, the other factors also favor Defendants.

### B. Irreparable Injury

The second preliminary injunction factor is whether the movants will suffer irreparable injury without an injunction. Infringement of a constitutional right is typically enough, and most courts require no further showing. *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). However, as discussed above, Plaintiffs have not made a clear showing of a constitutional injury sufficient to establish standing. Similarly, following the same analysis, Plaintiffs have not shown that they will suffer an irreparable injury without an injunction, because it is unlikely that they can establish that their constitutional rights are being, or will be, infringed.

Additionally, the delay in the challenge to the Toolkit[10] weakens Plaintiffs' argument of irreparable injury. The Toolkit went into effect in February 2021; this challenge was brought three years later, in 2024. The Tenth Circuit has held that "delay in seeking [injunctive] relief cuts against finding irreparable injury." *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (cleaned up). Three years of delay in seeking emergency relief undermines Plaintiffs' argument that emergency relief is necessary. *See Slusser v. Mountain W. Conf.*, No. 1:24-CV-03155-SKC-MDB, 2024 WL 4876221, at *7 (D. Colo. Nov. 25, 2024) (denying injunctive relief and finding delay in bringing suit—two years after enactment and months after it was first enforced—was not reasonable); *GTE Corp. v. Williams*, 731 F.2d 676, 679 (denying preliminary injunction and noting "movant's delay in bringing suit

---

[10] Arguably the real focus of Plaintiffs' claims, as it is the policy that most directly addresses parental support.

is an important factor in determining irreparable harm."). Similarly here, Plaintiffs' three-year delay in challenging the Toolkit undermines their claim of impending irreparable injury. The second factor also favors Defendants.

### C.   Balance of Harms

The balance of harms factor also favors denying the injunction. Absent an injunction, Plaintiffs face a speculative possibility of future harm. However, as the requested injunction would only enjoin Defendants from enforcing the Law and Policies as applied to Plaintiffs' children, granting an injunction for that limited purpose would not result in much harm to the District, as long as it does not impact other students. However, it is possible that a limited injunction could discourage the District from applying the Law and Policies to other students. This would be a tangible harm because it would impede the District's ability to support LGBTQ+ students and create a learning environment free from discrimination. The balance of harms factor is largely neutral because it would only apply to Plaintiffs' children, but it slightly favors Defendants.

### D.   Public Interest

It is in the public interest to protect Plaintiffs' constitutional rights. However, it is unlikely that Plaintiffs will be able to show that their constitutional rights have been infringed, as discussed above. The public also has an interest in establishing learning environments free from discrimination, and Defendants have made a clear showing that the Law and Policies facilitate that interest. This factor favors Defendants.

## IV.  CONCLUSION

Because Plaintiffs have not met their burden of showing that each preliminary injunction factor is met, the Court DENIES their motion for a preliminary injunction, ECF No. 2.

DATED this 24th day of January 2025.

BY THE COURT:

Charlotte N. Sweeney
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:24-cv-2185-CNS-SBP

JOHN AND JANE DOE,

      Plaintiffs,

v.

PHILIP WEISER, in his official capacity as Attorney General of the State of Colorado;
SUSANA CÓRDOVA, in her official capacity as Commissioner of the Colorado
Department of Education; and
SCHOOL DISTRICT 27J a/k/a 27J SCHOOLS, in its official and personal capacities,

      Defendants.

---

## ORDER

---

Before the Court is the motion to dismiss filed by Defendant Philip Weiser, the Attorney General of the State of Colorado. ECF No. 63. For the reasons below, the Court GRANTS the motion.

### I.  BACKGROUND[1]

Plaintiffs are challenging House Bill 24-1039, codified at Colo. Rev. Stat. §§ 22-1-145, *et seq.* (the Law), and the District's related policies. ECF No. 52 at 38 (First Amended Complaint). They seek a permanent injunction preventing Defendants from implementing or enforcing the Law and Policies. *Id.* House Bill 24-1039, effective April 2024, requires public school employees to address students by their chosen name reflecting that

---

[1] The Court's recent Order on the motion for a preliminary injunction, ECF No. 82, provided a detailed background of the case, which it need not repeat here.

student's gender identity, and provides that knowingly failing to do so is discriminatory.[2] C.R.S. § 22-1-145 *et seq.*

Plaintiffs requested a preliminary injunction on August 7, 2024. ECF No. 2. Defendant Weiser filed the present motion to dismiss on November 5, 2024. ECF No. 63. The other Defendants also filed motions to dismiss on November 5, 2024. ECF Nos. 61, 62. Plaintiffs responded on November 26, 2024, and Defendants replied on December 10, 2024. ECF Nos. 70, 77. The Court denied Plaintiffs' motion for a preliminary injunction on January 24, 2025. ECF No. 82.

## II.  LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Assertion of Eleventh Amendment immunity is a challenge to the Court's subject matter jurisdiction under Rule 12(b)(1). *See Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1259 (10th Cir. 2002). To survive a Rule 12(b)(1) motion to dismiss, "a plaintiff must demonstrate that the court has subject matter jurisdiction." *Audubon of Kan., v. U.S. Dep't of Interior*, 67 F.4th 1093, 1108 (10th Cir. 2023). "A Rule 12(b)(1) motion to dismiss only requires the court to determine whether it has authority to adjudicate the matter." *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1108 (10th Cir. 2019). "The party invoking federal jurisdiction has the burden to establish that it is proper, and there is a presumption against its existence." *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (internal quotations omitted).

---

[2] C.R.S. § 22-1-145(1)(a) states:
> (2) A public school employee, educator, and contractor . . . shall address a student by the student's chosen name and use the student's chosen name in school and during extracurricular activities.
> (3) Unless done at a student's request, knowingly or intentionally using a name other than the student's chosen name or the knowing or intentional avoidance or refusal to use a student's chosen name is discriminatory.

A_000903

### III.  ANALYSIS[3]

The Court agrees that Defendant Weiser is entitled to Eleventh Amendment sovereign immunity, and thus the Court lacks jurisdiction over the claims against him.

"The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)). The bar extends to suits against officials in their official capacities. *Hendrickson v. AFSCME Council 18,* 992 F.3d 950, 965 (10th Cir. 2021) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Suits are permitted against state officials "seeking to enjoin alleged ongoing violations of federal law," but the official "must have some connection with the enforcement of the act." *Peterson*, 707 F.3d at 1206 (quoting *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011)); *Ex parte Young*, 209 U.S. 123, (1908).

For the *Ex parte Young* exception to apply, the state official must have both "a particular duty to enforce" the statute and "a demonstrated willingness to exercise that duty." *Peterson*, 707 F.3d at 1205. Such a duty cannot be a "mere general duty to enforce the law"; it must arise from the challenged law, another law, an administrative delegation, or a demonstrated practice of enforcing a provision. *Hendrickson*, 992 F.3d at 965; *Peterson*, 707 F.3d at 1207. When a state law "explicitly empowers one set of officials to enforce its terms, a plaintiff cannot sue a different official absent some evidence that the

---

[3] The Court previously addressed this issue in its order on Plaintiffs' motion for a preliminary injunction when it analyzed the likelihood of success on the merits. ECF No. 82. It need not repeat that analysis in full here.

defendant is connected to the enforcement of the challenged law." *Peterson*, 707 F.3d at 1207.

HB24-1039 does not impose any enforcement duty on the Attorney General. Instead, it delegates enforcement to the public schools. The Law provides: "A student who is subject to discrimination pursuant to subsection (3) of this section may file a report with the public school in accordance with the requirements of section 22-1-143 (2) or file a complaint under the public school's or local education provider's policy adopted pursuant to Title IX of the federal 'Education Amendments of 1972', 20 U.S.C. sec. 1681 et seq., as amended." C.R.S. § 22-1-145(4). The public schools and local education providers, therefore, have the specific duty to enforce HB24-1039, and not the Attorney General.

Plaintiffs argue that the Attorney General has the general authority to enforce Colorado's laws and reference numerous statutes that vest the Attorney General with this general enforcement duty.[4] However, a general enforcement duty is not enough to avoid

---

[4] One of these statutes, which Plaintiffs reference for the first time in their response, is the Colorado Anti-Discrimination Act (CADA). Plaintiffs request that the Court "construe the FAC to seek prospective relief against enforcement of CADA." ECF No. 70 at 43. The FAC, however, does not include a claim requesting such relief and the Court will not imply a cause of action where none has been asserted. Plaintiffs assert that, "while the Does did not originally interpret CADA to require schools to socially transition students upon their request without regard to parental consent, they accept the Commissioner's assertion that it does." *Id.* at 17. The referenced assertion in the Commissioner's motion to dismiss is:

> The Colorado General Assembly expanded the Colorado Anti-Discrimination Act ("CADA") to prohibit discrimination on the basis of transgender status in 2008, clarifying in 2021 that this prohibition includes gender identity and gender expression. See 2008 Colo. Sess. Laws, ch. 341 (SB 08-200); 2021 Colo. Sess. Laws, ch. 156 (HB 21-1108). And since 2009, the agency rules implementing CADA have provided: "Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun" is prohibited harassment. 3 Code Colo. Regs. 708-1, Rule 81.8(A)(4) (original rule, eff. Nov. 30, 2009); id. at Rule 81.6(A)(4) (current rule, eff. Dec. 30, 2023).

ECF No. 62 at 18. The Commissioner referenced CADA to support the assertion that "Colorado has a compelling interest in creating a school environment where students feel safe and welcomed so that they may focus on learning." For purposes of this Order, the Court notes that Plaintiff's arguments about the Attorney General's ability to enforce CADA do not alter the fact that HB24-1039 does not delegate a specific

Eleventh Amendment immunity. An official's "general enforcement power . . . does not suffice for *Ex parte Young*." *Hendrickson*, 992 F.3d at 967. The *Ex parte Young* exception therefore is not applicable here based on the first prong alone.

Regardless, Plaintiffs also fail to establish the "willingness to exercise an enforcement duty" prong of the exception. There are no allegations that the Attorney General has taken action to enforce HB24-1039 against the District, or any other school district. The Attorney General's support of antidiscrimination policies generally is insufficient to demonstrate a willingness to exercise an enforcement duty.[5] Because Plaintiffs have not established that the Attorney General has a particular duty to enforce HB24-1039, or that he has demonstrated a willingness to exercise that duty, he is entitled to Eleventh Amendment sovereign immunity. The Court thus lacks subject matter jurisdiction and must dismiss the claims against the Attorney General.

## IV. CONCLUSION

Because Defendant Weiser is entitled to Eleventh Amendment sovereign immunity, the Court GRANTS the motion to dismiss, ECF No. 63.

DATED this 24th day of January 2025.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

---

enforcement duty to the Attorney General, nor has the Attorney General brought an action under CADA's antidiscrimination provisions in this arena.

[5] *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1223–24 (S.D. Cal. 2023), in contrast, held that the California Attorney General was a proper party because the Attorney General had previously taken enforcement action against two school districts.